LINUS L. BAKER MO 44980
6732 WEST 185TH TERRACE
STILWELL, KANSAS 66085
913.486.3913
LINUSBAKER@PRODIGY.NET
*Attorney for Emily Welcome and Charlotte Grahovac*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| **Emily Welcome** **and** **Charlotte Grahovac** | |
| Plaintiffs | Case No. |
| v. | |
| **Amplity, Inc.** | |
| Defendant | |

**COMPLAINT**

COMES NOW PLAINTIFFS Emily Welcome and Charlotte Grahovac, by their undersigned attorney, for their employment and disability complaint against the defendant Amplity, Inc..  The plaintiffs seek nominal, actual and punitive damages in fair and reasonable amounts, costs, attorney fees, expenses, interest, reinstatement, and further legal and equitable relief the Court may grant to remedy Defendant's unlawful acts.  The plaintiffs allege as follows:

**NATURE OF THE ACTION**

**1.** The plaintiffs Emily Welcome and Charlotte Grahovac were employed at Amplity, Inc. (Amplity or the Company) as Biosimilar Account Specialists (BAS). Ms. Welcome began her employment on August 27, 2018.  Ms. Grahovac began her employment on January 2, 2020.  After their employment, Amplity later advertised for "Immunology Specialty Representative" which stated "we are seeking high performing immunology

**1**

specialty representatives." Under the "Education/Experience" category it listed this: "Proof of Covid 19 Vaccination Required." Although the plaintiffs' respective immunity status or her medical condition had nothing to do with their education or experience, Amplity did not provide for any medical or religious accommodations to its Covid-19 vaccination requirement which, on its face, violates Title VII and demonstrates that Amplity had predetermined to make this an absolute requirement with no exceptions.

**2.** Both plaintiffs were assigned to customer Organon, which sells immunology and oncology biosimilar products to health care providers, infusion centers and hospital systems. At that time there was no requirement placed upon either plaintiff, as part of her job description, to disclose her immunity status or consent to unwanted medical procedures.

**3.** Amplity changed the conditions of the plaintiffs' employment by enacting a requirement that she subject herself to multiple and unwanted gene therapy injections ("vaccines" or "the Injections"). Erica Smith, Sr. Director, People & Organizational Effectiveness, stated that "engaging in these interactions unvaccinated and on behalf of the company puts our colleagues, our clients, patients and the company at great risk."

**4.** In denying the plaintiffs' respective religious accommodation requests, Amplity stated "engaging in these interactions unvaccinated and on behalf of the company puts you and the company at great risk." Amplity stated that no accommodations

would be granted if the plaintiff posed a "direct threat to the health or safety of others in the workplace."

5. It was, according to Amplity, the plaintiffs' respective immunity status that purportedly would jeopardize and threaten the health and safety of Amplity's employees and customers due to her position involving in-person interaction with customers and employees.

6. As to safety, Amplity made OSHA its real linchpin of terminating the plaintiffs' employment based upon its workplace safety risk reasoning. Amplity claimed that the plaintiffs presented an OSHA workplace risk. But despite the vaccination mandate being aimed at increased safety, curiously the Company did not mitigate or otherwise require regular testing – the most reliable protection against the spread of the virus, especially since it was widely known during the relevant timeframes that vaccinated individuals could contract and transmit COVID.

7. The crux of Amplity's termination reasoning comes under the "qualified individual" element in an Americans with Disabilities Act case which Amplity is heard to claim that neither plaintiff can perform the essential functions of her position because she poses a direct threat to the safety of other individuals in the workplace.

8. Put another way, the policy and their termination regarded a "qualified individual with a disability" but would be justified "if she poses a direct threat to the health or

3

safety of other individuals in the workplace." 42 U.S.C. § 12113(b); *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir. 1996)).

**9.** So Amplity theorizes it has a defense to a charge of discrimination for qualifications standards, that otherwise deny a job or benefit to an individual with a disability, which are shown to be job-related and consistent with business necessity. 42 U.S.C. §12113(a). Under the ADA, "qualification standards" may include a requirement that an individual shall not pose a direct threat to health or safety of other individuals in the workplace." 42 U.S.C. §12113(b),

**10.** Amplity's covid-19 policy and its termination of Ms. Grahovac and Ms. Welcome because of their respective immunity status is indeed pointing to their respective medical conditions – a vaccine immunity status. Under the ADA, where "the perceived threat to safety arises from an employee's medical condition, determination of whether that condition constitutes a direct threat "shall be based on reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence." 29 C.F.R. §1630.2(r)). "The employer bears the burden of proving that an employee … poses a direct threat." *EEOC v. Hussey Copper Ltd.,* 696 F.Supp. 2d 505, 520 (W.D.Pa. 2010).

**11.** When Amplity terminated Ms. Welcome and Ms. Grahovac, it did not have any documentation concerning defining or analyzing either's risk to other employees or customers, the duration of the risk, the nature and severity of the potential harm, the likelihood that the potential harm will occur; or the imminence of the potential harm. *See* 29 C.F.R. §1630.2(r).

**12.** When Amplity terminated Ms. Grahovac, it had not obtained a health care professional to specifically assess Ms. Grahovac's purported safety risk to any coworkers or customers based on the objective, scientific information available to that professional or others in that profession.

**13.** When Amplity terminated Ms. Welcome, it had not obtained a health care professional to specifically assess Ms. Welcome' purported safety risk to any coworkers or customers based on the objective, scientific information available to that professional or others in that profession.

**14.** When Amplity terminated each of the plaintiffs, it had no reasonable medical judgment that evaluated any plaintiffs' immunities and one which relied on the most current medical knowledge and/or the best available objective evidence that either plaintiffs' immunity status posed any threat to the safety of any customer or fellow employee.

**15.** Under Title VII, there is no undue-hardship-*plus* exception. In fact, Amplity claimed that posing a health threat to customers and co-employees was the purported undue hardship which is not a legitimate Title VII analysis.

**16.** If OSHA's existing regulations required COVID-19 vaccinations then OSHA wouldn't have needed to issue an Emergency Temporary Standard which was immediately enjoined by the Fifth Circuit. *See BST Holdings, L.L.C. v. OSHA*, 2021 U.S. App. LEXIS 33698 (5th Cir. 2021). "Vaccinations" do not prevent the spread of the Covid-19 virus, do not promote workplace safety, and Amplity is not required by

OSHA or any state or federal law to require its employees to consent to vaccine injecting.

**17.** On November 8, 2021, Ms. Welcome submitted a religious accommodation request under Title VII to Amplity with an explanation of her religious beliefs. On November 22, 2021, Amplity rejected that accommodation request stating that "your refusal to be vaccinated is based upon a sincere belief that is religious in nature. At this time, the Exemption Review Board does not believe this criteria was met."

**18.** Amplity then stated that "even if your exemption request is approved, Amplity is not able to provide a reasonable accommodation for your current role. The Biosimilar Account Specialist role requires regular in-person engagements with HCPs in medical offices and facilities to successfully perform in the job. Engaging in these interactions unvaccinated and on behalf of the company puts you and the company at great risk.

**19.** This was the identical response given to the plaintiff Charlotte Grahovac in response to her religious accommodation request that was submitted October 28, 2021 by Ms. Grahovac and rejected by Amplity on November 12, 2021.

**20.** In the responses given to the plaintiffs Welcome and Grahovac respective religious accommodation requests, Amplity questioned the sincerity of each of the plaintiffs' religious beliefs. Yet in the EEOC charge response, Amplity stated that "Ms. Welcome's termination had absolutely nothing to do with her religious beliefs"

which is directly controverted by the reason provided by Amplity stating her stated beliefs did not meet the sincerity requirement.

21. According to Amplity, it terminated the plaintiffs' respective employment because neither complied with Organon's vaccine policy. But Amplity never supplied the plaintiffs with that policy or its terms. It was later discovered that the Organon policy provided for religious accommodations. But Amplity never provided the plaintiffs an avenue to make accommodation requests to Organon or to receive responses from Organon regarding those requests regarding Organon's vaccine policy. Thus, Amplity terminated the plaintiffs for violating Organon's vaccine policy without any interactive discussion about that or providing any accommodation process regarding Organon's vaccine policy.

22. Amplity required employees to be "fully vaccinated" and defined it as meaning "two weeks following the final dose of a COVID-19 vaccine that has received final approval by the U.S Food and Drug Administration (FDA) and the World health Organization (WHO)." It is unknown how Organon defines its vaccine requirement and was unknown at the time of the plaintiffs' employment terminations.

23. In its EEOC charge response, Amplity stated that it had terminated 15 of its employees for violation of Amplity's policy. Amplity did not inform the EEOC that it had not terminated any employees because of non-compliance with Organon's vaccine policy.

7

**24.** There were other Amplity employees that were allowed to remain employed at Amplity without being "fully vaccinated" as defined by Amplity's vaccine policy. There were other Amplity employees that were allowed to remain employed at Amplity without being vaccinated pursuant to the Organon vaccine policy.

**25.** Amplity communicated to both plaintiffs that, beginning December 1, 2021, they each would be placed on unpaid leave for an undetermined period beginning on that date. Despite that communication, Amplity then stopped paying Ms. Welcome on November 24th and then converted her employment to unpaid leave status on November 29th Ms. Welcome's remaining accrued paid time off (PTO) with the company was entered for the 5 days in between per Ms. Welcome's request to Amplity HR in order for her to receive this PTO rather than allow the company to avoid paying this earned PTO portion.

**26.** Amplity HR had neglected to make this offering up front and eventually back dated Ms. Welcome's PTO days. This conduct was in retaliation by Pam Feola, Amplity HR representative, who had previously denied Ms. Welcome's request regarding making a disability filing on December 8, 2021, (after Ms. Welcome had spoken with the Hartford group regarding an ADA claim).

**27.** During that unpaid leave status Ms. Welcome's appeal of her request denial continued. During that time she was able to keep Amplity owned equipment and have Amplity systems access. However, Ms. Welcome was given six documents to

8

terminated employees including a "Close Out Guide- BSST Guide." The appeal and accommodation process was entirely illusory.

**28.** These actions, including placing Ms. Welcome on unpaid leave status prior to her December 13, 2021, termination was coercive.

**29.** Amplity took Ms. Welcome's position, posting this position as open on employment forums, and put her on unpaid leave - all of which are adverse employment actions and constructive termination. Amplity violated Title VII by taking these adverse employment actions during the purported accommodation process.

**30.** Ms. Grahovac began her employment with Amplity on 1/2/2020. Ms. Grahovac's exemption request was denied on 11/12/21. Amplity stated Ms. Grahovac had until 11/24/21 to decide to consent to the vaccine mandate. Ms. Grahovac was placed on unpaid leave status on 12/1/21 and provided closeout information during the accommodation process. Ms. Grahovac was terminated on 12/10/21.

**31.** Amplity posted Ms. Grahovac's Chicago Territory BAS position as open during the accommodation process and while she was on unpaid leave status.

**32.** As of 12/10/2021, both plaintiffs were aware that Amplity employees in the same team, who consented to the vaccine mandate, were given promotions after 3+ years of service and some received raises as well.

**33.** The COVID-19 vaccination status of Amplity employees is irrelevant to mitigating the risks of transmission of COVID-19. Vaccinated and unvaccinated

employees transmit COVID-19 at roughly the same rate. No evidence proves otherwise. Any risks, therefore, posed by unvaccinated employees such as the plaintiff mirror those posed by vaccinated employees.

**34.** Amplity has never required vaccinations for Hepatitis B, Pertussis, or other communicable diseases; nor have they required disclosure of vaccination status as part of their Occupational Safety and Health Act compliance plan. Yet despite these facts, Amplity has never been cited or faced an enforcement action under the Occupational Safety and Health Act due to the vaccination status of their employees or their vaccination policies.

**35.** Tellingly, Amplity failed to explain in its EEOC charge response why it delayed imposing its mandate for 11 or 18 months in the face of a supposed compelling necessity of protecting workplace safety. In fact, the entire BAS sales force which the plaintiffs belonged to had been measured successfully as working from their home office space conducting virtual meetings and virtual educational meals since March 2021. The established office work space with company provided printer, computer, etc. was established as an effective and necessary working environment to engage customers even prior to the Covid pandemic.

**36.** Amplity claimed there was a legal liability in permitting Ms. Welcome to continue to be employed without a Covid-19 vaccine injection. Amplity contends that the plaintiffs' immunity status posed a workplace risk. OSHA does regulate certain diseases as hazards, but no regulation requires vaccination. See 29 C.F.R. § 1910.502 (COVID-19 protocols).

**37.** Amplity's great-risk-by-interaction claim means the company was claiming it would be out of compliance with the Americans with Disabilities Act because of the plaintiffs' respective immunity status. Contrary to Amplity's pretextual goal of OSHA "workplace safety," Amplity was never subjected to any legal liability regarding the immunity status of its employees. There was no legitimate business justification for Amplity's actions. As has been seen with other employers, the "real reason for the vaccine mandate…was 'virtue signaling' and 'currying political favor.'" *Sambrano v. United Airlines*, 45 F.4th 877, 879 (5th Cir. 2022) (Ho, J., concurring in denial of rehearing en banc); see also *Louisiana v. Becerra,* 2021 WL 5609846, at *14 (W.D. La. Nov. 30, 2021)("Although CMS spent pages and pages attempting to explain the need for mandatory COVID-19 vaccines, when … millions of people have already been infected, developing some form of natural immunity, and when people who have been fully vaccinated still become infected, mandatory vaccines as the only method of prevention make no sense"). Ms. Welcome offered natural immunity blood antibody testing in her exemption request(s) as one of many means for accommodations, as her family had all previously and naturally overcome the SARs virus early spring 2021.

**38.** Reliable scientific data establishes that prior infection is likely thirteen times more effective than vaccination alone in preventing reinfection and/or breakthrough infection. https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1

**39.** While this case implicates the Company's factual and legal justifications for its mandate purportedly based upon "great risk," and "direct threat to the health or

safety of others in the workplace," putting that aside, this case is about whether Amplity could have accommodated sincerely held religious beliefs when it was within the Company's power to do so at little to no cost. A company's virtue signaling goals are not permitted goal under Title VII.

**40.** This is an action for religious discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., on the grounds that Defendant failed to reasonably accommodate the plaintiffs' sincerely held religious objection to a mandatory consent-to-COVID-19-injections policy which each plaintiff to consent to vaccine injections, wrongly denied requested religious exemptions, and as a result illegally terminated employment. Plaintiff Welcome asserts a concurrent claim under the Missouri Human Rights Act (R.S.Mo. Ch.213) for failure to accommodate her disability and failure to religiously accommodate her.

**41.** By this action, the plaintiffs seek all legal and equitable relief available, including reinstatement, back pay, front pay, lost future earnings, out of pocket costs, compensatory damages, punitive damages, and attorney's fees and costs. Plaintiffs demand a trial by jury.

## PARTIES

**42.** Plaintiff Emily Welcome is an adult resident of Lees Summit, Missouri. At all relevant times, Welcome was an "employee" of Amplity within the meaning of Title VII and applicable state law. Plaintiff Charlotte Grahovac is an adult resident of Gurnee, Illinois. At all relevant times, Grahovac was an "employee" of Amplity in the same position as Ms. Welcome.

12

**43.** Defendant Amplity is a corporation with its principal place of business at 2080 Cabot Boulevard, Suite 100 Langhorne, PA 19047. At all relevant times, Amplity had more than 500 employees. At all relevant times, Amplity was the plaintiffs' "employer" within the meaning of Title VII and applicable state law.

## JURISDICTION AND VENUE

**44.** This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 2000e-5(f)(3) (Title VII).

**45.** This Court has supplemental jurisdiction over Plaintiff Welcome's state law claims pursuant to 28 U.S.C. § 1367, because Plaintiffs' federal and state law claims derive from a common nucleus of operative facts and form part of the same case or controversy under Article III of the U.S. Constitution.

**46.** This Court has venue over this action pursuant to 28 U.S.C.§§ 1391(b)(1) and (b)(2) and 42 U.S.C. § 2000e-5(f)(3) (Title VII), because Defendant resides in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## ADMINISTRATIVE EXHAUSTION

**47.** Plaintiffs properly exhausted their respective administrative remedies under Title VII prior to filing this action.

**48.** Within 180 days of the alleged discriminatory acts, Welcome filed a charge of discrimination against Amplity with the MCHR. The charges were assigned charge numbers  E-12/21-53570 (MCHR) and 28E-2022-00300 (EEOC).

**49.** On November 2, 2022, the MCHR issued a Notice of Right to Sue.

**50.** This action was filed within 90 days of Welcome's receipt of the Notice of Right to Sue.

**51.** Within 180 days of the alleged discriminatory acts, Grahovac filed a charge of discrimination against Amplity with the EEOC. The charge was assigned number 440-2022-02725. The Illinois Human Rights Commission assigned No. 2022CR2231.

**52.** On October 20, 2022, the EEOC issued a Notice of Right to Sue.

**53.** This action was filed within 90 days of Grahovac's receipt of the Notice of Right to Sue.

## ALLEGATIONS

**54.** At all relevant times, both Grahovac and Welcome were qualified for their respective employed positions with Amplity and performed her duties in a satisfactory manner.

**55.** Amplity's workplace safety justification for its mandate has no merit because:

    a. The overwhelming evidence shows that the Covid 19 Injections are not vaccines but gene therapy and do not prevent transmission, infection, or reinfection in those who consent to receive them.

    b. The CDC Director has admitted that the Injections do not prevent infection or transmission of SARS-CoV-2, the virus that has been identified by various public health agencies as causing the disease known as COVID-19.

14

c. The CDC has acknowledged that the "vaccinated" and "unvaccinated" are equally likely to spread the virus.

**56.** The mRNA platform is not a vaccine, but rather gene therapy in the form of biological "software" designed to genetically "hack" the machinery of human cells to create a specific protein that genetically modifies human cells.

**57.** The specific protein that human cells are "hacked" to create is the spiked protein of the disease itself. The Injections genetically modify human cells to create the same toxic protein that the disease itself creates – the spiked protein. These spiked proteins adhere to the endothelial cells of humans, the very cells that line the entire cardiovascular system. The spike proteins adhere to the interior of the cardiovascular system like thorns on a rose bush, causing a variety of detrimental effects, the short- and long-term impact of which are currently unknown and unknowable.

**58.** When Amplity announced its vaccine mandate, it stated that employees could request accommodations for religious or health reasons. This is in line with Equal Employment Opportunity Commission ("EEOC") guidance on private employers issuing such mandates. *See* What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws §§ K.1 & K.2., EEOC (May 28, 2021).

**59.** Amplity's announcement was illusory for religious Amplity employees such as the plaintiffs, Althea Zouras, and Kelly Lambert.

**60.** Amplity's Covid-19 policy was facially contrary to Title VII. It stated that "in a continuing commitment to the health and safety our colleagues, clients, health care

providers and their patients, and in consideration of guidance released by the CDC, Amplity Health is implementing a mandatory COVID-19 vaccination policy."

**61.** Amplity stated we will engage in an interactive process to determine if a reasonable accommodation can be provided that does not create an undue hardship on our business and/or does not pose a direct threat to the health or safety of others in the workplace and/or to the colleague." Amplity posted Ms. Welcome's territory position as "open" on LinkedIn as well as the Amplity company website as of December 1, 2021 during her purported accommodation process and unpaid leave status without allowing the accommodation process to complete itself and despite the fact Ms. Welcome still held the position and had not been terminated.

**62.** This undue hardship with an added "direct threat to the health or safety of others in the workplace" ADA requirement implicitly asserts that each plaintiff has a disability under 42 U.S.C. §12102(1)(C)(3)(A)-(B) but that Amplity has a defense to discriminating against that disability under the ADA.

**63.** The Injections are not effective against the Omicron variant of SARS-CoV-2 in that they do not prevent the recipient from becoming infected, getting reinfected, or transmitting SARS-CoV-2 to others. Evidence shows that the vaccinated contain greater amounts of SARS-CoV-2 in their nasal passages than the unvaccinated.

**64.** Amplity was concerned about its reputational image in the industry, though. Evidently, Amplity believed other companies would think less of the Company if it employed unvaccinated religious individuals and so it took steps to rid itself of as

many disfavored religious employees as it could if they had what Amplity determined to be an "illegitimate" reason for not consenting to the vaccine injections.

65. The illogic of the policy is further demonstrated. Amplity employees able to comply with the Company's mandate were vaccinated with either the Pfizer, Moderna, or Janssen vaccine. Because many Amplity employees would have taken a COVID-19 vaccine long before the Company's mandate, some of those individuals had not received a vaccine in more than six months (the efficacy waned and therefore *more* susceptible to infection than unvaccinated employees) when unvaccinated employees were put out of work. Yet this made sense to Amplity that those vaccinated employees with diminished or no vaccine efficacy did not present a workplace safety issue.

66. Putting aside the fact that Ms. Grahovac or Ms. Welcome did not present any greater workplace safety risk than any other "vaccinated" employee, Amplity could have accommodated each without undue hardship effortlessly through mitigation of symptomatic, masking/testing of everyone or even the recognition of natural immunity, remote work, or any combination of these options.

67. The Amplity policy created two classes of employees; injected and uninjected. The members of one class, the uninjected, get terminated. The uninjected cannot advance their careers. They cannot provide for their families, pay their mortgages, or make a car payment. The other class, the vaccinated, get to keep their job in their chosen profession, advance their careers, provide for their families, pay their mortgages, and make their car payments.

17

**68.** Yet the situations of these employees are indistinguishable because injected Amplity employees can become infected with SARS-CoV-2, become re-infected with SARS-CoV-2, and can transmit SARS-CoV-2 to fellow workers and customers – studies indicating they are more likely to do so. The Injections make no difference in those respects. Their only purported function supported by science is to make symptoms less severe for the injected person.

**69.** So the Company wanted to brand itself as "fully vaccinated" as a signal to other companies, even if that meant trampling on its religious employees' Title VII rights. Moreover, demonstrating the pretextual nature of Amplity's vaccination strategy, Amplity's definition of "fully vaccinated" was only that someone take a primary series of the vaccine – not a step that would actually make someone "fully vaccinated." The mandate was about virtue signaling and ridding itself of disfavored religious employees more than the safety of employees or customers.

**70.** According to its written policy, Amplity viewed CDC "guidance" as its polestar. Amplity's policy did not require "boosters." But at the time Amplity created its policy, CDC guidance and other studies acknowledged that vaccine injections did not hinder the transmission of the SARS virus at all.

**71.** Theoretically, being injected with a Covid-19 vaccine does not, in and of itself, purport to make anyone "safer." Put another way, vaccination status doesn't necessarily mean anything in terms of any so called workplace safety. Thus, the act of being injected is meaningless: being injected with a saline solution does not

magically protect anyone. Rather, it is the purported artificially induced immunity that is at issue. And to the extent the efficacy of a vaccine dissipates over time, the Company took no steps to evaluate anyone's actual immunity levels.

72. The Company's workplace safety issue is premised on the plaintiffs' immunity status – specifically not being vaccine injected with Covid-19 vaccine(s) – created an unsafe working environment. Ms. Welcome's or Ms. Grahovac's immunity status could not, was not, and is not, a workplace risk as alleged by Amplity.

73. When the U.S. Supreme Court stayed the Occupational Safety and Health Administration's Emergency Temporary Standard – requiring all employers with at least 100 employees to ensure their workforces are fully vaccinated for COVID-19 – it rejected the argument that the generic risk of contracting COVID-19 qualifies as a "work related danger." *NFIB v. DOL*, 142 S. Ct. 661, 665 (2022). Recently, the Ninth Circuit rejected an agency's "broad interpretation of its existing regulations as applying generally to COVID hazards in the workplace." *Flower World, Inc.*, 2022 U.S. App. LEXIS at *17 (9th Cir. Aug. 11, 2022).

74. To the point: submitting to a Covid-19 vaccine is not workplace conduct subject to OSHA as held by the Supreme Court in *Nat'l Fed'n Indep. Bus. v. OSHA*, 595 U.S. ___ (2022).

75. Consequently, the workplace health and safety citation derived from OSHA is fatally flawed because the Occupational Safety and Health Act of 1970, 29 U.S.C. §

15 et seq., only allows OSHA "to set workplace safety standards" but "not broad public health measures" such as vaccine mandates as cited by Amplity.

**76.** And in *NFIB*, the Supreme Court specifically held that COVID-19 is not a workplace risk, but rather a "universal risk" that is "no different from the day-to-day dangers that all face from crime, air pollution, or any number of communicable diseases." *NFIB*, 595 U.S. ___ slip op. at 6. Accordingly, *NFIB* held, requiring employees to get vaccinated against COVID-19 is outside OSHA's ambit.

**77.** Not only is Amplity's OSHA-safety premise flawed, so too the factual underpinning for the purported workplace safety issue. Amplity invoked OSHA to support its undue hardship / workplace safety claim. But that was built upon the mythical and conjured conclusion that a Covid-19 vaccine would prevent the transmission of the Covid-19 virus (which it never did and currently does not according to the most recent studies and findings).

**78.** Not only did the vaccines never prevent transmission, their purported efficacy to diminish virus symptoms is actually 180 degrees opposed to Amplity's policy according to statistics. Now, the more people get Covid-19 vaccinated, they make up a greater proportion of fatalities.

**79.** Bottom line is this: being Covid vaccine injected increases the likelihood of death. Current statistics now reveal that the real pandemic is of the "vaccinated" according to a study cited in the Washington Post in which an analysis conducted by the Kaiser Family Foundation demonstrated that in January and February of 2022 up to 42

percent of deaths were for the vaccinated. It has now increased to 58% as of August of this year and continues to climb.

**80.** On October 5, 2021, Amplity enacted a new policy requiring the plaintiffs to consent to covid-19 vaccine injections. The policy required compliance by November 24, 2021. The Amplity policy provided for a December 1, 2021, deadline but as to "Amplity field-based employees working on behalf of Organon" such as Emily a November 24, 2021, deadline was imposed.

**81.** Organon purportedly instituted a policy requiring its employees to be "fully vaccinated" by November 24, 2021. The policy did not include third parties such as the plaintiffs.

**82.** The Organon policy provided for exceptions "to the extent permitted by law (e.g. individual has an approved exemption as an accommodation for medical or religious related reasons."

**83.** Organon allowed multiple religious and medical exemptions in their own women's health division. Organon had the same hybrid environment (virtual contacts) as the biosimilar sales division under Amplity… meaning they can be face to face with hospitals and staff or virtual when appropriate. Their accommodation includes mask and weekly Covid testing. Additional accommodations for Organon included but were not limited to, virtual meeting options for companywide National Sales meetings abroad. The "unvaccinated" employees were able to participate ("tune in") to the scheduled June's 2022 in-person meeting for national employees.

**84.** Yet just before the Company published its October 2021 Covid-19 policy to require Covid-19 vaccine injections, the U.S. Centers for Disease Control and Prevention ("CDC") Director, Dr. Rochelle Walensky, stated on October 8, 2021, about COVID-19 vaccines that the vaccines never prevented transmission: "what they cannot do any more is prevent transmission."

**85.** At the time of the Company's denial of religious exemptions, the FDA acknowledged that while it was hoped that the COVID-19 vaccines would reduce or prevent the transmission of the virus, "the scientific community does not yet know if the COVID-19 Vaccines will reduce such transmission."

**86.** A CDC study released in January 2022 not only demonstrated that vaccination provides no discernible benefit to the naturally immune, but it provided conclusive evidence that naturally acquired immunity confers superior protection against the Delta variant (including against transmission).

**87.** But even under the CDC guidance when Amplity enacted its Covid policy, CDC issued revised guidance during that time period due to new data "that the Delta variant was more infectious and was leading to increased transmissibility when compared with other variants, even in some vaccinated individuals."

**88.** As of October 27, 2021, the CDC's "Nowcast" model which tracked proportions of circulating variants in the United States reported that the Delta variant comprised 99.6% of the variants recently detected throughout the U.S.

**89.** It was well understood from October 2021 when Amplity published its vaccine mandate that the Delta variant was "spreading in settings where there is high vaccine coverage."

**90.** These studies indicated that vaccinated individuals were susceptible to infection with the Delta variant and presented a risk of transmitting SARS-CoV-2 to others.

**91.** The researchers in a University of Wisconsin Study within the relevant time frame concluded that, "a substantial proportion of individuals with SARS-CoV-2 vaccine breakthrough infections during [their] study period ha[d] levels of SARS-CoV-2 RNA in nasal secretions . . . consistent with the ability to transmit the virus to others."

**92.** Amplity also ignores Grahovac's and Welcome's own personal safety under its invocation of OSHA workplace safety / health hardship argument.

**93.** The long-established CDC database VAERS (Vaccine Adverse Events Reporting System) demonstrates significantly higher reports of deaths and adverse events with the Injections than with prior vaccines. There were reports of neurological adverse events, including Guillain-Barre, Bell's Palsy, Transverse Myelitis, Paralysis, Seizure, Stroke, Dysstasia, Aphasia, and Tinnitus, as well as cardiovascular events such as clot and cardiac arrest.

**94.** The latest peer reviewed study SERIOUS ADVERSE EVENTS OF SPECIAL INTEREST FOLLOWING MRNA COVID-19 vaccination IN RANDOMIZED TRIALS IN ADULTS AUGUST 31, 2022 https://www.sciencedirect.com/science/article/pii/S0264410X22010283 include

researchers from Stanford University, the University of Maryland, and UCLA. The study provides the following list of confirmed adverse events (or side effects) of the respective mRNA vaccines. It also provides the risk ratios versus Covid-19 (over 1 is a factor increase, under 1 is a factor decrease).

- "In July 2021, the FDA reported detecting four potential adverse events of interest: pulmonary embolism, acute myocardial infarction, immune thrombocytopenia, and disseminated intravascular coagulation following Pfizer's vaccine based on medical claims data in older Americans.... Three of these four serious adverse event types would be categorized as coagulation disorders, which is the Brighton AESI category that exhibited the largest excess risk in the vaccine group in both the Pfizer and Moderna trials."
- "In the Moderna trial, the excess risk of serious AESIs (15.1 per 10,000 participants) was higher than the risk reduction for COVID-19 hospitalization relative to the placebo group (6.4 per 10,000 participants)"
- "In the Pfizer trial, the excess risk of serious AESIs (10.1 per 10,000) was higher than the risk reduction for COVID-19 hospitalization relative to the placebo group (2.3 per 10,000 participants)."

**95.** There is extensive evidence that the spike protein produced in the body as a result of the inducement of the covid vaccine substance into a body causes micro-clotting throughout the body, permanently damaging the recipient's cardiovascular system.

**96.** Immediately prior to Amplity's Covid-19 mandate, Israeli researchers in a large study conducted during the summer of 2021 (and issued in late August 2021) found that "in one of the most highly COVID-19–vaccinated countries in the world, examined medical records of tens of thousands of Israelis, charting their infections, symptoms, and hospitalizations between 1 June and 14 August, when the Delta

variant predominated in Israel" and found natural immunity stronger and longer lasting that that induced by the Pfizer vaccine.

**97.** Amplity viewed Welcome's and Grahovac's immunity status as a disability. Amplity demanded that this purported immunity disability be remedied by Covid-19 vaccine injections. Ultimately, it was known to Amplity at the relevant times that a Covid-19 vaccine injected-person did not prevent transmission and would have been as contagious or even more as a non-vaccinated person once they contract the Delta variant – yet conducted itself as though vaccines increased workplace safety by purportedly preventing transmission.

**98.** The proffered health/safety workplace hardship espoused by Amplity in providing Ms. Welcome and Ms. Grahovac a religious accommodation is undocumented, and relies upon hypotheticals and speculation contrary to science.

**99.** There was no objective, scientific basis for the Company to argue that vaccine injecting protected against transmission or in not granting the plaintiffs religious exemption such that it would have posed a greater risk or an undue risk to any clients, staff, or fellow employees of contracting COVID-19 from Welcome.

**100.** Upon information and belief, Amplity has employed and is employing persons since December 1, 2021, that are not "fully vaccinated" as defined under the Amplity Covid-19 Vaccination Policy.

**101.** Upon information and belief, every Amplity employee allowed to be employed by Amplity since December 1, 2021, without being "fully vaccinated" has not caused Amplity any undue hardship.

**102.** And despite the fact that "vaccinated" employees were contracting – and spreading Covid (or Delta and Omicron variants which prior vaccinations had no effect upon) – those employees were not terminated.

**103.** Amplity's policies were thus punitive toward religious employees such as these plaintiffs who should have been accommodated. Many, if not all of them, had natural immunity to the virus and therefore posed an equal or lower risk to others than the vaccinated secular employees who had not previously contracted COVID-19.

**104.** Additionally, religious Amplity employees objecting to the vaccine injections were all willing to observe safety practices such as symptomatic mitigation, remote work, masking, and testing. Not only had such measures been adequate for the prior months of the pandemic (before the Amplity policy), mitigation, remote work, and/or testing represented the best means of reducing/preventing COVID-19 transmission for both vaccinated and unvaccinated individuals.

**COUNT I**
**FAILURE TO ACCOMMODATE**
**VIOLATION OF ADA & REHAB ACT**

**105.** Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

**106.** Plaintiffs bring this action against the defendant under the Americans with Disabilities Act of 1990, as amended by the ADA Amendments Act of 2008 ("ADA"),

42 U.S.C. §§ 12101 et seq., which incorporates, through 42 U.S.C. § 12117, the powers, remedies, and procedures set forth in Title VII of the Civil Rights Act of 1964, as amended, included in 42 U.S.C. § 2000e et seq., in addition to its implementing Regulations, the Rehabilitation Act of 1973, as amended ("Rehabilitation Act"), 29 U.S.C. §§ 701 et seq.,

**107.** According to the defendant, each plaintiff has a physical or mental impairment that does not substantially limit major life activities but is treated by Amplity as constituting such limitation.

**108.** According to the defendant, each plaintiff has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

**109.** Plaintiffs have no such impairment but is treated by Amplity as having a substantially limiting impairment.

**110.** Amplity's vaccine policy considers the plaintiffs' medical condition of being "unvaccinated" as a disability.

**111.** Amplity terminated the plaintiffs because of her perceived disability constituting not having artificially induced immunities to the SARS virus.

**112.** The considered disorder by Amplity was a condition concerning each plaintiff's functions such as speaking, breathing, learning, and working.

**113.** Defendant discharged each plaintiff.

**114.** Defendant discharged each plaintiff because of this perceived disability.

**115.** There was nothing in the Company's job description of a plaintiff's job that required that they have immunities to any disease.

**116.** The Company implemented a written anti-discrimination policy which prohibits discrimination against employees based on the employee's religion, yet the Company has discriminated on the basis of religion and disability.

**117.** Amplity regarded Ms. Grahovac and Ms. Welcome as having a physical impairment that substantially limited her ability to work, based on Defendant's knowledge of her immunity and vaccine status.

**118.** Throughout their employment, each plaintiff could perform the essential functions of her job with or without accommodation.

**119.** Plaintiffs' case is predicated on direct evidence of disability discrimination and a claim of pretext, i.e., circumstantial evidence.

**120.** Each plaintiff was terminated because the Company regarded her as disabled in that: the Company either: (1) as a result of the attitudes of others toward such impairment considered the plaintiff as having a physical or mental impairment that substantially limits major life activities only; (2) was treated by Amplity as having a substantially limiting impairment even though the plaintiff had no such impairment; or (3) Amplity's vaccine policy and actual termination of each plaintiff considered her medical condition as not being "fully vaccinated" as disability.

121. The Company's policy and its termination of each plaintiff's employment demonstrate that it views employees not "fully vaccinated" as having inferior immune systems. According to the Company, Welcome's and Grahovac's purportedly inferior immune system did not and would not protect other employees sufficiently or as well as her "fully vaccinated" colleagues, irrespective of the time lapse of receiving any vaccine injection, and thus she would be a direct threat to the safety of fellow employees and customers being purportedly more likely to transmit the Covid 19 virus.

122. According to the Company, Welcome's and Grahovac's immunity disability significantly restricted each in the ability to perform not merely a particular job but an entire class and broad range of jobs at the Company.

123. Defendant has provided inconsistent explanations for the plaintiffs' discharge, including claiming her religious beliefs were insincere, claiming workplace safety when vaccination status is not a work place activity and do not prevent transmission, showing the pretextual nature of Defendant's explanation for discharging each plaintiff.

124. Defendant directly caused each plaintiff damages, including economic harm, emotional distress, pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other losses under the aforementioned federal statutes.

## COUNT II
### Violation of Title VII, 42 U.S.C. § 2000e, et seq.
### Religious discrimination – disparate treatment

**125.** Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

**126.** Plaintiffs each hold a sincere religious beliefs that precludes her from consenting to Covid-19 vaccine injecting. Amplity has speculated as to the sincerity of each plaintiff's beliefs but each provided a set of beliefs that was comprehensive and clear, even if the Company misconstrued them, did not understand, or want to credit those beliefs.

**127.** Plaintiffs informed Amplity of those beliefs and requested religious accommodations from the vaccine mandate.

**128.** By requesting religious accommodations from Amplity, Plaintiffs established herself as a member of a protected class.

**129.** Plaintiffs' employee records demonstrate unquestionably that she was qualified for the position. That is why, prior to the mandate, each plaintiff had no indication that her job was in jeopardy – indeed, each had been successful for a substantial amount of time prior to the vaccine edict and, absent Amplity's unlawful actions, would still be working there.

**130.** Plaintiffs suffered an adverse employment action when Amplity threatened to suspend her pay and then terminated her after she declined – on religious grounds – to consent to multiple injections of a COVID-19 vaccine. At the same time, others at

the Company were provided accommodations from the vaccine mandate for secular reasons and not terminated.

**131.** In fact, on December 10, 2021, during Ms. Welcome's unpaid leave employment status, her peers were announced as promoted (as a reward for following company vaccine mandate and also a distraction from the unvaccinated layoffs) for 3+ years of tenure and company growth since the launch of the biosimilar division with Ms. Welcome's training class in 2018.

**132.** In the meantime, Ms. Welcome's peers were told by Amplity management that Ms. Welcome was still employed at Amplity regarding this promotion but within a different division moving forward.

**133.** Amplity contended that Ms. Welcome and Ms. Grahovac cannot be sincere but provided neither with any explanation as to how or why. Then, the appeal process was illusory for the additional reason there was no factual basis stated for Amplity's conclusions yet purportedly could conduct a review of these unknown factors.

**134.** By denying her religious exemption to the mandatory COVID-19 vaccination policy which required each plaintiff to consent to multiple vaccine injections and then terminating her employment, the defendant violated each plaintiff's rights under Title VII.

**135.** Title VII provides, inter alia, that "[i]t shall be an unlawful employment practice for an employer … to discharge any individual … because of such individual's … religion …." 42 U.S.C. § 2000e-2(a)(1). Title VII further defines "religion" to include

"all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."

136. Accordingly, under Title VII it is unlawful "for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of her employees…." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977); *see also Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 68 (1986) ("The employer violates the statute unless it 'demonstrates that [it] is unable to reasonable accommodate … an employee's … religious observance or practice without undue hardship on the conduct of the employer's business.'") (quoting 42 U.S.C. § 2000e(j)).

137. Defendant was recklessly indifferent to each plaintiff's federally protected rights.

138. And at the same time Amplity was discriminating against each plaintiff, the Company knew that vaccinated employees were regularly contracting and spreading COVID-19.

139. Prior to its Covid-19 vaccine enforcement date, Amplity was able to efficiently provide any services provided by each plaintiff to any customer or fellow employee.

140. Amplity was able to efficiently provide any requested services by a customer while providing a religious accommodation regarding Ms. Welcome's and Ms. Grahovac's religious convictions.

141. Both plaintiff's work was outstanding, and she had no performance issues throughout their respective employment with Defendant.

142. Amplity was not committing any OSHA workplace safety violations in permitting each plaintiff to be employed and interact with customers and co-employees prior to the effective date of Amplity's Covid-19 vaccine policy.

143. Amplity would not have committed any OSHA workplace safety violations in permitting each plaintiff to be employed unvaccinated and interact with customers and co-employees after the effective date of Amplity's Covid-19 vaccine policy.

144. Amplity did not act in good faith in any interactive communication process.

145. Amplity did not conduct a reasonable investigation into the plaintiffs' immunity status, whether she had similar or greater immunity to a Covid-19 virus as compared to a vaccine injected employee having artificially induced temporary immunities.

146. Amplity did not require employees to report events in which a customer complained or was turned away because of the Amplity's employee's immunity or vaccine status prior to effective date of Amplity's Covid-19 policy.

147. Amplity did not conduct a reasonable investigation into whether requiring Ms. Welcome or Ms. Grahovac to be Covid-19 vaccine injected would prevent the transmission of the Covid-19 virus prior to her termination.

**148.** It was not an undue hardship upon Amplity to provide Ms. Grahovac or Ms. Welcome a religious accommodation in the performing of her essential functions as an employee of Amplity.

**149.** Allowing Grahovac and Welcome to work unvaccinated until December 13, 2021, did not increase the use or claim of employee sick days for that period of time.

**150.** In fact, there were vaccinated Amplity employees that took sick leave because of a self-reported or diagnosed Covid-19 infection prior to December 13, 2021, and afterwards.

**151.** Amplity has no documentation that its vaccination policy reduced the spread of Covid-19 infections or reduced the number of sick days taken by an employee self-reporting or diagnosed with a Covid-19 infection.

**152.** Amplity has no documentation as to any customers, their number, or dollar amount in sales being lost or reduced by allowing either plaintiff to be employed at her position prior to the effective date of Amplity's vaccination requirement.

**153.** Amplity has no documentation as to any customers, their number, or dollar amount in sales being gained as a result of terminating either plaintiff's employment at Amplity.

**154.** After Ms. Welcome and Ms. Grahovac were terminated, Amplity has no documentation showing that there was any reduction in an employee's use of sick days, or health insurance claims arising from a Covid-19 infection.

**155.** While each plaintiff was employed, Amplity has no documentation that it was required to hire additional employees or any staff as a direct result of allowing Ms. Welcome to be employed during the time period of Amplity's Covid-19 vaccine policy enactment through December 13, 2021, when Ms. Welcome was terminated.

**156.** Amplity has no documentation that demonstrates Amplity was required to rearrange staffing or incur additional costs during the time period of Amplity's Covid-19 vaccine policy enactment through December 13, 2021, the date when Ms. Welcome was terminated.

**157.** Allowing Ms. Welcome to work unvaccinated through December 13, 2021, did not cause employee sicknesses, disruptions, jeopardize safety, cause other employees to work longer hours, nor did it cause Amplity to lose any customer traffic.

**158.** Amplity conducted no studies or analysis yielding any documentation that allowing Ms. Welcome or Ms. Grahovac to work unvaccinated through December 13, 2021, caused or increased employee sicknesses, disruptions, safety risks, or caused or contributed to other employees being required to work longer hours.

**159.** Amplity was not required to hire any additional workers nor did it suffer the loss of production because of allowing Ms. Grahovac or Ms. Welcome to work unvaccinated through December 13, 2021.

**160.** Since terminating each plaintiff and replacing each plaintiff with another employee at the same position, Amplity has no evidence of any loss or gain of

customer satisfaction, store traffic, or profits associated with terminating each plaintiff's employment and replacing her with a vaccinated employee.

161. Amplity has no evidence of any loss or increase in market share, customer loyalty, or store traffic due to accommodating or not accommodating the religious beliefs of an employee at any time.

162. Similarly, Amplity has no evidence of an increase in customer satisfaction, Bank traffic, or profits associated with not providing religious accommodations to Amplity employees since December 2021.

163. Even engaging in the invented idea that vaccine injections hindered transmission, in Amplity's policy it admits it can accommodate religious requests by "wearing of personal protective equipment (including but not limited to masks and/or other face coverings), changes to the nature of the job duties performed by the employee, reassignment, or other conditions." Yet in the interactive process and determination, Amplity did not consider those accommodations for Ms. Welcome or Ms. Grahovac.

164. The fact is Amplity adopted a process that does not even permit the possibility of approval for a religious accommodation because Amplity predetermined that anyone unvaccinated for religious reasons would present a workplace safety issue that could not be accommodated.

165. All this evidences pretext on the part of Amplity since the Company has proffered an undue hardship explanation that is "unworthy of credence" − it is

"apparent that unlawful discrimination was more likely the employer's motivation." *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

166. Religious employees who were willing to participate in safety measures such as symptomatic reporting, remote work, masking, and testing and/or who had natural immunity were terminated; secular employees who were induced with waning artificial immunities (even those immunized with an incomplete vaccine series providing arguably inferior immunization) were allowed to keep their jobs, as were secular employees with medical excuses not to take the vaccine.

167. Amplity's policies were thus punitive toward religious employees such as the plaintiff who should have been accommodated. Many, if not all of Amplity employees, developed some sort of natural immunity to the SARS virus and therefore posed an equal or lower risk to others than the vaccinated secular employees who had not previously contracted COVID-19.

168. Additionally, the plaintiff was willing to observe mitigation practices such as self-reporting of symptoms, remote work, masking, and testing. Not only had such measures been adequate for the prior 18 months of the pandemic, self-reporting, remote work and/or testing represented the most efficient means of reducing/preventing COVID-19 transmission for both vaccinated and unvaccinated individuals during workplace hours.

169. Yet Amplity treated religious employees worse because of their religious objection to the vaccine. (NOTE: A truly preventative policy would have required

something such as regular testing for all employees, especially those who had not previously recovered from a COVID-19 infection even if they were vaccinated.)

170. In other words, Amplity required naturally immune religious employees to possess hybrid immunity (vaccine-based immunity + natural immunity (which studies demonstrated may actually reduce the totality and length of immunity)) and subjected them to heightened protocols in the name of workplace safety because of their religious beliefs. At the same time, Amplity rewarded secular vaccinated employees, even though they presented an equal or greater contagion hazard relative to religious naturally immune employees, because Amplity favored those employees' views on COVID-19 vaccines.

171. Moreover, the Company enforced its policy with the full knowledge and with intent to adversely affect religious employees disproportionately. Indeed, instead of implementing plans to accommodate religious employees, Amplity implemented discriminatory policies and created a questionnaire design to assist the Company in denying religious exemption requests. It is believed that after denying 100% of religious exemption requests, the Company cannot now argue that the accommodations process was actually instituted in good faith.

172. Amplity never planned to provide each plaintiff a reasonable accommodation and its supposed "interactive process" sought only to gain information it might later be able to use against this plaintiff who deigned to push back on the Company's unlawful actions. Amplity subjected the plaintiff to its sham process, seeking information about people's beliefs, personal information, and medical histories even

though the Company never planned to accommodate them anyway. This all took place because of each plaintiff's religious beliefs and they would not have had to undergo that process but for their sincerely held religious beliefs about the COVID-19 vaccine.

**173.** Amplity plainly did not want religious requests to succeed and purposefully plotted to deny those requestors.

**174.** Any non-discriminatory reason proffered by Amplity – such as increased safety – was pretextual. By allowing vaccinated employees to avoid necessary preventative measures like testing, while not even allowing exempt employees like the plaintiff to use them, the Company has undermined any legitimate nondiscriminatory reason it might have tried to claim as it relates to workplace safety. Moreover, as the evidence shows, the "direct threat to the health or safety of others in the workplace and/or to the colleague" (OSHA-Workplace-safety) legal and factual rationale for treating unvaccinated employees differently (especially those with natural immunity) was non-existent long before Amplity put religious employees out of work here. At all relevant times, it was abundantly clear that these "vaccines" were not preventing transmission of the virus. And added to the above, once the Omicron variant swept across the country, more evidence existed contradicting Amplity's policy as no vaccine served as a means to even reduce symptoms and certainly as any means to hinder transmission. It was thus unlawful to discriminate against religious employees such as these plaintiffs.

**175.** If Amplity's justification truly was to help provide for a safe work environment during the COVID-19 pandemic, the Company would not have chosen a Covid-19

vaccine requirement as a solution or singled out those who had natural immunity and/or were willing to submit to self-reporting, or testing for worse treatment because they could not take the vaccine for religious reasons.

**176.** The OSHA workplace health/safety argument contained in the statement "direct threat to the health or safety of others in the workplace and/or to the colleague" was clearly a pretext on nearly every level. Amplity's purposeful attack on religious beliefs is made apparent by Amplity's failure to investigate, its disregard of law and science, or its willful ignorance of the science and the CDC's guidance in March, July, and August of 2021, establishing that the vaccines would never prevent or even reduce Covid virus transmission.

**177.** Considering these factors, a strong inference of intentional religious discrimination exists, and any non-discriminatory reason asserted by Amplity is inauthentic.

**COUNT III**
Violation of Title VII, 42 U.S.C. § 2000e, et seq.
Religious discrimination—failure to accommodate

**178.** Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

**179.** Plaintiffs each hold a sincere religious beliefs that precludes her from consenting to a COVID-19 vaccine. Indeed, her beliefs were sincere enough to cause her to accept termination from a career she enjoyed rather than betray her beliefs.

**180.** Plaintiffs each informed Amplity of those beliefs and requested religious accommodations from its vaccine mandate.

**181.** Amplity refused to engage in an actual interactive process with each plaintiff regarding her religious accommodation request and instead only responded to Ms. Welcome and Ms. Grahovac with questions (or other coercion) designed to deter her from exercising their religious beliefs.

**182.** Amplity did not bother engaging in a true interactive process with religious accommodation seekers such as each plaintiff because it never intended to provide her with a reasonable accommodation.

**183.** Irrespective of the interactive process, Amplity failed to provide each plaintiff with reasonable accommodations for her religious beliefs.

**184.** In fact, Amplity failed to consider reasonable accommodations (such as self-reporting of symptoms, masking, testing, and natural immunity) because it never intended to accommodate religious employees and was only interested in coercing them to take the vaccine.

**185.** If the military, vaccine manufacturers or other employer companies, including Amplity and Organon, can provide reasonable religious accommodations to Covid-19 injections to employees, then Amplity could have done so as well regarding these plaintiffs.

**186.** The Company's attempts to dodge providing reasonable accommodations by casting aspersions on Plaintiffs' religious objections to the vaccine fail on their face. The plaintiff detailed her sincerely held religious beliefs only to be rejected when the Company claimed to the EEOC that each plaintiff had not shown a satisfactory basis

for an accommodation on religious grounds. This position is post hoc and was a sham, however, since the denial was predetermined before the request was made as part of a pattern of discrimination against those unable to consent to COVID-19 vaccine injections because of their sincerely held religious beliefs.

187. The rejections of the plaintiffs' beliefs were simply transparent rejections of religion as a suitable reason not to become one of "the vaccinated." Amplity did not welcome religious requests and determined as a result not to accept religious exemption requests. The canned denial communications that failed to grapple with any requestor's requests are further proof that the Company did not treat religious requests in good faith align with the Company's overall pattern of discrimination.

188. Amplity thereby discriminated against each plaintiff because of her religious beliefs.

189. Amplity's failure to provide religious accommodations has harmed and will continue to harm each plaintiff.

190. By failing to engage in a true interactive process or offer any reasonable accommodation, Amplity's discriminatory actions were intentional and/or reckless and in violation of Title VII.

**COUNT IV**
Violation of Title VII, 42 U.S.C. § 2000e, et seq.
Religious discrimination—retaliation

191. Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

**192.** Plaintiffs engaged in protected activity when she requested religious accommodations from Amplity's vaccine mandate.

**193.** As with other religious employees, Amplity responded with improper questioning of each plaintiff's religious beliefs aimed at forcing her to acquiesce while having prepared a legal defense against her Title VII rights ahead of time.

**194.** The Company also subjected religious employees such as these plaintiffs to unwanted coercion and other tactics aimed at punishing their beliefs and making them regret requesting an accommodation based on religious grounds.

**195.** Ms. Welcome was threatened with unpaid leave and termination if she did not comply with Amplity's mandate.

**196.** The "choice" Amplity has given religious employees such as these plaintiffs "has created a crisis of conscience, pressuring them to abandon their religious commitments. By threatening termination, [Amplity] has enlisted employees and their families in the project of reforming employees' religious commitments. Putting employees to this coercive choice imposes a distinct and irreparable harm beyond lost pay, benefits, seniority, and other tangible and remediable losses." *See Sambrano*, 19 F.4th at 842 (Ho, J., dissenting) ("To hypothesize that the earthly reward of monetary damages could compensate for these profound challenges of faith is to misunderstand the entire nature of religious conviction at its most foundational level").

**197.** This coercion was a concerted effort from Amplity management—a fact the Company did not attempt to conceal.

**198.** Finally, Amplity terminated each plaintiff as a result of her request for a religious exemption. Had she sought a medical exemption, she would have been subject to neither the ongoing coercion nor termination.

**199.** Plaintiffs' religious beliefs and protected activity were the causes of Amplity's adverse employment action.

**200.** By retaliating against the plaintiff for engaging in protected activity, Amplity violated Title VII. This violation has harmed and continues to harm each plaintiff.

**COUNT V**
Violation of Title VII, 42 U.S.C. § 2000e, et seq.
Religious discrimination—disparate impact

**201.** Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

**202.** Plaintiffs each hold a sincere religious beliefs that precludes each of them from consenting to a COVID-19 vaccine. Indeed, her beliefs were sincere enough to cause each to accept termination from a career each enjoyed rather than betray each plaintiff's beliefs.

**203.** Plaintiffs each informed Amplity of those beliefs and requested religious accommodations from the vaccine mandate, thus identifying herself to the Company as part of a protected class.

**204.** Amplity's mandate had an adverse effect on each plaintiff who was unable to consent to a COVID-19 vaccine injection for religious reasons.

**205.** This violation of Title VII has harmed and continues to harm each plaintiff.

44

## PRAYER FOR RELIEF AS TO ALL FEDERAL COUNTS

WHEREFORE, each plaintiff requests that the Court:

a. Declare that Amplity has violated Title VII by discriminating against employees seeking religious accommodations to its COVID-19 vaccine mandate, disfavoring their exemption requests because they were based on religious reasons rather than secular ones.

b. Declare that Amplity has violated Title VII by failing to engage in a good-faith interactive process and provide reasonable accommodations in response to requests for religious accommodations to its COVID-19 vaccine mandate.

c. Declare that Amplity has violated Title VII by retaliating against employees who engaged in protected activity.

d. Declare that Amplity's vaccine mandate—with no accommodations for religious employees—had a disparate impact on those unable to take a COVID-19 vaccine for religious reasons.

a. Award each Plaintiff nominal and actual damages including:

   i. Termination or employee misconduct contained in her personnel file;

   ii. Deterioration in job skills;

   iii. Lost bonus pay;

   iv. Lost seniority;

   v. Loss of preferential shifts and other adverse impacts on working conditions;

   vi. Loss of wages;

   vii. Extreme stress and anxiety and;

viii. Attorney fees and costs.

Pursuant to Federal Rule of Civil Procedure 38, each plaintiff demands a jury trial on all issues upon which there is a federal right to a jury trial.

**COUNT VI**
Missouri Human Rights Act

206. Plaintiff Welcome restates the foregoing paragraphs as if set forth fully herein.

207. Plaintiff Welcome was an "employee" of Defendant for purposes of The Missouri Human Rights Act.

208. Plaintiff is a "person" as defined by R.S.Mo. § 213.010(15).

209. Throughout her employment, Plaintiff could perform the essential functions of her job with or without accommodation.

210. Plaintiff filed a Charge of Discrimination with the Missouri Commission on Human Rights, alleging Defendant discriminated against her.

211. The MCHR issued the plaintiff a right-to-sue notice.

212. Amplity has violated MCHR by discriminating against this employee seeking religious accommodations to its COVID-19 vaccine mandate, disfavoring her exemption requests because they were based on religious reasons rather than secular ones.

213. Amplity has violated MCHR by failing to engage in a good-faith interactive process and provide reasonable accommodations in response to requests for religious accommodations to its COVID-19 vaccine mandate.

46

**214.** Amplity has violated MCHR by retaliating against this employee who engaged in protected activity.

**215.** Amplity's vaccine mandate—with no accommodations for religious employees—had a disparate impact on those unable to take a COVID-19 vaccine for religious reasons under the MCHR.

WHEREFORE, the plaintiff Emily Welcome prays for judgment finding Defendant liable for this Count and awarding the plaintiff actual and punitive damages in an amount that is fair and reasonable, costs, interest, reinstatement, all other relief the Court may grant.

### COUNT VII
Disability Discrimination
(R.S.Mo. § 213.055)

**216.** Plaintiff Welcome restates the foregoing paragraphs as if set forth fully herein.

**217.** Plaintiff Welcome had a disability for purposes of the Missouri Human Rights Act.

**218.** Defendant discharged Plaintiff.

**219.** Defendant discharged Plaintiff because of her disability.

**220.** There was nothing in the Company's job description of Welcome' position that required that Welcome have immunities to any disease or to obtain immunities to any disease.

47

**221.** In fact, the Company promised not to discriminate against Welcome on the basis of religion in that the terms of employment. The Company implemented a written anti-discrimination policy which prohibits discrimination against employees based on the employee's religion,

**222.** The Company's actions discriminated against Welcome's disability and her religion.

**223.** The MHRA defines "disability" as a:

> physical or mental impairment which substantially limits one or more of a person's major life activities, being regarded as having such an impairment, or a record of having such an impairment, which with or without reasonable accommodation does not interfere with performing the job, utilizing the place of public accommodation, or occupying the dwelling in question.

Section 213.010(4). Employment is a "major life activity" included in MHRA disability discrimination protections. See 8 CSR 60-3.060(1)(C).

**224.** During Plaintiff's employment with Defendant, she was a person with a "disability" as defined by R.S.Mo. § 213.010(5), in that Defendant regarded Plaintiff as having a physical impairment that substantially limited her ability to work, based on Defendant's knowledge of Plaintiffs' immunity and vaccine status.

**225.** Throughout her employment, Plaintiff could perform the essential functions of her job with or without accommodation.

**226.** Welcome was terminated because the Company regarded her as disabled in that: the Company either: (1) wrongly believed that she had an impairment that

48

substantially limited one or more major life activities or (2) wrongly believed that an actual, non-limiting impairment substantially limited one or more major life activities.

227. The Company's actions show that it views un-vaccinated employees as having inferior immune systems. According to the Company, Welcome's purportedly inferior immune system did not protect other employees sufficiently or as well as her vaccinated colleagues and thus she would be more likely to transmit the Covid 19 virus. That is a perceived disability protected against discrimination in the workplace.

228. According to the Company, Welcome, because of her immunity status, was substantially limited in performing a major life activity for purposes of the MHRA because, according to the Company, she was unable to perform or significantly restricted as to the condition, manner or duration under which she could perform a particular major life activity.

229. According to the Company, Welcome' immunity disability significantly restricted Welcome in the ability to perform not merely a particular job but an entire class and broad range of jobs at the Company.

230. Defendant has provided inconsistent explanations for the plaintiff's discharge, including claiming her religious beliefs were insincere, claiming workplace safety when vaccination status is not a work place activity and do not prevent transmission, showing the pretextual nature of Defendant's explanation for discharging Plaintiff.

**231.** Defendant directly caused Plaintiff damages, including economic harm, emotional distress, pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other losses including the deprivation of Plaintiffs' civil rights under Missouri law.

**232.** The actions and conduct set forth herein demonstrate a reckless indifference or conscious disregard for the rights of Plaintiff and others

WHEREFORE, the plaintiff Welcome prays for judgment finding Defendant liable for this Count and awarding the plaintiff actual and punitive damages in an amount that is fair and reasonable, costs, fees, expenses, interest, reinstatement, all other relief the Court may grant.

## JURY TRIAL DEMAND

PLAINTIFFS HEREBY REQUEST A JURY TRIAL

By:/s/Linus L. Baker
Linus L. Baker MO 44980
6732 West 185th Terrace
Stilwell, Missouri 66085-8922
913.486.3913
913.232.8734 (fax)
E-Mail: linusbaker@prodigy.net
Attorney for the plaintiffs