**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

**Emily Welcome et al**

                              Plaintiff

v.                                                   Case No. 4:22-cv-00830-RK

**Amplity Inc.**

                              Defendant

---

## PLAINTIFFS EMILY WELCOME'S AND CHARLOTTE GRAHOVAC'S JOINT OPPOSITION TO AMPLITY'S MOTION FOR SUMMARY JUDGMENT

Comes now Emily Welcome ("Emily") and Charlotte Grahovac ("Charlotte"), by and through their attorney and pursuant to Rule 56.01 of the Federal Rules of Civil Procedure do hereby set forth to the Court their Joint Opposition to Amplity's Motion for Summary Judgment.

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................i

Response to Statement of Facts ...............................................................................ii

Additional Statement of Facts ..............................................................................xliv

Argument ..................................................................................................................1

Amplity's Spaghetti Approach of Shifting of Reasons Alone Has Created Jury Questions ...................................................................................................................1

Direct Evidence ........................................................................................................4

No Accommodation Was Considered or Offered .....................................................7

Rule 26 Disclosures Preclude Any Ability of Amplity to Overcome Hearsay Objections.................................................................................................................9

Amplity Cannot Meet Any Undue Hardship under *Groff* .....................................10

*Bushra* is Contrary to *Groff* ..............................................................................12

Putting Aside the Horses, the Review Board Predetermined Every Outcome While Creating the Illusion of Ongoing Case-by-Case Decision Making ..........................14

Conclusion ..............................................................................................................15

# TABLE OF AUTHORITIES

*Brown v. Smith*, 827 F.3d 609 (7th Cir. 2016)......................................................8

*Bushra v. Main Line Health, Inc.*, No. 23-1090, 2023 WL 9005584

(E.D. Pa. Dec. 28, 2023) .......................................................................................12

*Cravens v. Blue Cross & Blue Shield of Kansas City,* 214 F.3d 1011

(8th Cir. 2000) .........................................................................................................7

*E.E.O.C. v. Geo Group, Inc.,* 616 F.3d 265 (3d Cir. 2010) ................................12

*EEOC v. Allstate Ins. Co.,* 528 F.3d 1042 (8th Cir.2008) ...................................7

*Fjellestad v. Pizza Hut of Am., Inc.,* 188 F.3d 944 (8th Cir.1999).......................8

*Floyd v. Trinity Central Home Health, LLC,* No. 6:22-cv-06117

WL 3653055 (W.D. Ark. Aug. 5, 2024) ...............................................................14

i

*Grant v. City of Blytheville,* 841 F.3d 767 (8th Cir. 2016)................................4

*Gray v. Main Line Hosps., Inc.,* 2024 U.S. Dist. LEXIS 26885

(E.D. Pa. Feb. 15, 2024) ................................................................................14

*Groff v. DeJoy,* 600 U.S. 447 (2023). ...........................................................10

*Hayslett v. Tyson Foods, Inc.,* No. 1:22-cv-01123(W.D. Tenn. Sept. 20, 2023) 14

*Hebrew v. Texas Dep't of Criminal Justice,* 80 F.4th 717 (5th Cir. 2023) .......13

*Isensee v. Amplity, Inc.,* 2024 WL 2132419 (S.D. Ohio West May 13, 2024)...14

*Joll v. Valparaiso Cmty. Schs.,* 953 F.3d 923 (7th Cir. 2020) ...........................4

*Lowe v. Calsonickansei N. Am., Inc.,* 2020 WL 2473757 (M.D. Tenn. May 13, 2020) ................................................................................................................8

*McNeill v. Tyson Fresh Meats, Inc.,* 2023 WL 8532408 (N.D. Texas, December 8, 2023) ..........................................................................................................5

*Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595 (6th Cir. 2018). ..............................................................................................................8

*Smith v. City of Mesa,* No. CV-21-01012-PHX-DJH, 2023 WL 2463819

(D. Ariz. Mar.10, 2023) ...................................................................................14

*Smith v. Kilgore*, 926 F.3d 479 (8th Cir. 2019)................................................10

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).....................................4

*U.S. v. Department of Corrections & Rehabilitation*, No. 2:24-cv-00925, 2024 LEXIS 109106 (E.D. Cal. June 20, 2024).........................................................14

*Valdez v. McGill*, 462 F. App'x 814 (10th Cir. 2012) .........................................8

*Walker v. Wayne Cnty, Iowa,* 850 F.2d 433 (8th Cir. 1988) ..............................9

*Williams v. United Parcel Serv., Inc.,* 963 F.3d 803 (8th Cir. 2020).................4

*Williams v. Wells Fargo Bank, N.A.,* 901 F.3d 1036 (8th Cir. 2018) ................7

29 C.F.R. 1630.2(p)(2) ....................................................................................13

ii

## RESPONSE TO STATEMENT OF FACTS

| ¶ | Amplity Statement of Fact | Response |
|---|---|---|
| 1 | Amplity is a New Jersey corporation with its principal place of business in Langhorne, Pennsylvania. | Objection to Green's Statement (ECF 83-1) as inadmissible as not complying with 28 U.S.C. §1746. But for purposes of this summary judgment only **Admit**. |
| 2 | Amplity is a Contract Medical and Commercial Organization that provides medical and commercial solutions to its customers. | Objection to Green's Statement as inadmissible. But for purposes of this summary judgment only **Admit**. |
| 3 | Amplity builds and manages teams that support its customers' sales and marketing efforts for example, pharmaceutical companies that are preparing to launch a new drug. | Objection to Green's Statement as inadmissible. But for purposes of this summary judgment only **Admit**. |
| 4 | Amplity's contracts with its pharmaceutical customers generally last two-plus years or more. | Objection to O'Loughlin's opinion as having no personal knowledge but for purposes of this summary judgment only **Admit**. |
| 5[1] | Amplity contracts with its customers dictate the number of Amplity employees that will work on the customers' behalf and whether the individuals will work remotely or in-person. | **Denied**.[2] Object as O'Loughlin's statement (Dictate the number of employees) is a legal conclusion. She has no personal knowledge as to each contract:<br>Ex. A ECF 78-19 (Plaintiffs' Motion for Summary Judgment) (O'Loughlin Deposition)[3] p.120:12-16.<br>Q But you didn't know of any client contract that required any sales people to be vaccinated, correct?<br>A Yeah. No. Again, I wasn't focused on the client.<br>O'Loughlin, p.70 21-24<br>"We did not review client information…that was not the purpose of the board." |
| 6 | Amplity customers pay 40-50% more for in-person promotion than it does for purely remote promotion. | **Denied**. Object as Green's statement is inadmissible as not complying with 28 U.S.C. §1746 and for all the reasons stated in the motion to strike.<br>Object as "customers" and 40-50% more for in person is vague and Green has no personal knowledge as to each client contract. |
| 7 | Amplity has a U.S. Colleague Handbook and a published policy that | **Admitted** that Handbook exists but objects to the statements asserted for the truth of |

---

[1] Amplity citations to the record do not identify exhibit numbers to each paragraph assertion. When citations were made to "Amplity" it is assumed this is Exhibit 4.

[2] All denials are made for only for the purpose of Opposing Amplity's motion for summary judgment.

[3] Amplity's Exhibit 2 (ECF 83-2).

| | | |
|---|---|---|
| | states Amplity provides equal employment opportunities to all qualified individuals and administers all aspects and conditions of employment without regard to, among all other protected classes, religion. | the matter as hearsay and therefore **Denies that part.** |
| 8 | Plaintiff Emily Welcome ("Welcome") is an adult individual, a former employee of Amplity and a resident of Missouri. | For purposes of this summary judgment only **Admit.** |
| 9 | Plaintiff Charlotte Grahovac ("Grahovac") 1s an adult individual, a former employee of Amplity and resident of Illinois. | For purposes of this summary judgment only **Admit.** |
| 10 | Welcome began her employment with Amplity as a Biosimilar Account Specialist on August 27, 2018 | For purposes of this summary judgment only **Admit.** |
| 11 | Grahovac began her employment with Amplity as a Biosimilar Account Specialist beginning on January 2, 2020 | For purposes of this summary judgment only **Admit.** |
| 12 | Grahovac worked remotely on behalf of Amplity's customer Merck until February 1, 2021, at which time she took a position working with Amplity's customer Organon | For purposes of this summary judgment only **Admit.** |
| 13 | Although Grahovac's position on behalf of Organon was not a remote position, when she began her new position in February 2021, it was the COVID-era, which forced her to work remotely. Charlotte Grahovac Dep. 12:3-7. The expectation was, once the COVID-era restrictions were no longer in place, that her position would be a face-to-face role. | **Denied.** The citation does not support this assertion. Charlotte did not say it was not a remote position. She just said at that time she was operating remotely. She only spoke to her expectation which was speculative. Objection in that it is speculation (Covid-era forced her and the "expectation" was). Charlotte has no personal knowledge to that. Object in that it is a legal conclusion with hearsay. |
| 14 | Welcome and Grahovac were both assigned to Amplity's customer Organon | For purposes of this summary judgment only **Admit** |
| 15 | In 2021, the total adjusted net revenue of Amplity's contracts with its pharmaceutical company customers that included Amplity providing field-based colleagues such as Welcome and Grahovac was $50.3 million. | **Denied.** Green's statement is inadmissible as not complying with 28 U.S.C. §1746 Objection as Amplity never produced that 50.3 million information in discovery even though it was specifically requested. *See* ECF 83-10 (Grahovac interrogatory 7). |
| 16 | In 2021, the total adjusted net revenue of the contract between Amplity and its customer Organon, to which Welcome and Grahovac were assigned, was $11.9 million - or nearly | **Denied.** Green's statement is inadmissible as not complying with 28 U.S.C. §1746 Objection as Amplity never produced that 11.9 million information in discovery even |

iv

| | 25% of the total revenue for that service. | though it was specifically requested. *See* ECF 83-10 (Grahovac interrogatory 7. O'Loughlin specifically testified that there was no economic analysis conducted by the Review Board and now, after discovery closes, Green purports to provide this information which has prejudiced plaintiffs. |
|---|---|---|
| 17 | Under its Agreement with Amplity, Organon has the right to terminate the agreement under which Welcome and Grahovac were providing services for its convenience by providing Amplity 120 days advance written notice. | **Denied**. Green's statement is inadmissible as not complying with 28 U.S.C. §1746 Objection as a legal conclusion (Green ¶7 Organon had a legal right to terminate… 120 days' notice). Object as undisclosed expert opinion testimony. Object to lack of personal knowledge and lack of foundation. |
| 18 | A material term of the Organon contract is Amplity's regular m-person engagements between its field-based colleagues and the healthcare practitioners and others to whom Amplity was marketing Organon's products. | **Denied**. Green's statement is inadmissible as not complying with 28 U.S.C. §1746 These assertions cannot be presented in a form that would be admissible in evidence. Objection as a legal conclusion (Green ¶8 Material term of the Organon contract). Object as undisclosed expert opinion testimony. Object to lack of personal knowledge and lack of foundation. Object as to what "colleagues" means. |
| 19 | Neither Welcome nor Grahovac has ever seen Amplity's contract with Organon and they have no knowledge of its terms or the finances involved in the contract. | **Denied** The citation does not support the assertion. The assertion assumes there is a contract. Whether there is, in fact, a contract with Organon, or purported finances, is not proven by Emily's or Charlotte's lack of knowledge. It is admitted that if there is such a contract neither Emily nor Charlotte has had it provided to them by Amplity. |
| 20 | An essential function of the Biosimilar Account Specialist position is in-person engagement with Amplity's customers Essential function. | **Denied**. Objection as "essential function" is a legal conclusion (defense counsel at the deposition objected as legal conclusion when question was asked). These assertions cannot be presented in a form that would be admissible in evidence. Objection as it is her bare assertion with no demonstration of personal knowledge as to any contract requirement. O'Loughlin does not have personal knowledge as to each client, each facility credentialing, or the contracts. |

| | | Ex. A ECF 78-19 O'Loughlin, p.120:12-16. O'Loughlin testified the Board did not "review clients. We did not review client information…that was not the purpose of the board."<br>Ex. A ECF 78-19 O'Loughlin, p.70 21-24<br><br>O'Loughlin admitted she had "no idea" which facilities had fully vaccinated requirement Ex. A ECF 78-19 p.153:10-15.<br>O'Loughlin admitted the board did not analyze any specifics as to Emily's facilities or clients.<br>Ex. A ECF 78-19 p. 155:24:24-p.156:16<br>Q Okay. You didn't do any specific analysis as to any of the clients that Emily Welcome served, did you?<br>A Not to my knowledge.<br>Q And, in fact, do you know that most of the clients that she had when she was terminated were all virtual?<br>Q Did you know that?<br>A I don't know the specifics of any of the individuals.<br>Q So why couldn't she have fulfilled her essential functions because she wasn't having any personal contact with those clients because it was virtual? Why couldn't she still have performed her essential functions, if you know?<br>A I don't.<br><br>It is further controverted by Amplity's job description which has percentages of remote interaction vs. in person activities. Plaintiff Ex. 1 (Sales Position Job vacancy description) (showing remote percentage not requiring face to face). |
| --- | --- | --- |
| 21 | Prior to the COVID-19 pandemic and its associated shutdowns, engagements between Amplity's field-based colleagues and the healthcare practitioners and others to whom Amplity was marketing Organon's products took place nearly exclusively face-to-face. | **Denied**.<br>Green's statement is inadmissible as not complying with 28 U.S.C. §1746<br>These assertions cannot be presented in a form that would be admissible in evidence. Objection as Green demonstrates no personal knowledge about "associated shutdowns" or "healthcare practicners and others" or how he knows anything about any of the sixty |

| | | |
|---|---|---|
| | | clients Charlotte served or the similar number Emily called on at any time.<br>Object as vague as to what the nomenclature "Field-based colleagues" is supposed to mean.<br>Further controverted in the job description which contemplated virtual contacts<br>O'Loughlin p.47:7-10<br>Q And it's not because clients asked you to do that or told you to do that, you just thought it was a good idea, right?<br>A We worked in -- yes. Yes. Yes. |
| 22 | Welcome and Grahovac promoted two Organon products, Renflexis® and Ontruzant®. | For purposes of this summary judgment only **Admit.** |
| 23 | Renflexis is prescribed by gastroenterologists and rheumatologists to patients with autoimmune disorders such as Crohn's disease, ulcerative colitis, and inflammatory bowel disease. | For purposes of this summary judgment only **Admit.** |
| 24 | Ontruzant is prescribed by oncologists and hematologists for the treatment of breast cancer. | For purposes of this summary judgment only **Admit.** |
| 25 | The Biosimilar Account Specialist position required Welcome and Grahovac to call upon infusion centers, doctor's offices and hospitals with infusion centers. | **Denied**.<br>The citations do not support the assertion. Neither testified that this "call upon" was a requirement.<br>Objection as "require" is a legal conclusion. It is further **Denied** to the extent "call upon" is intended to mean personal contact.<br>It is admitted that Emily and Charlotte communicated with these facilities by various means.<br>Plaintiffs' Ex. 2 (Charlotte Sworn Statement); Ex. 3 (Emily Sworn Statement) |
| 26 | In addition to doctors, the sales presentations included infusion staff, nurses, patient-intake personnel, and decision makers. | **Denied** to the extent that Emily's presentations are also how Charlotte makes presentations which Emily would not have personal knowledge of.<br>It is also **Denied** that for Emily her presentations always included infusion staff, nurses, patient-intake personnel, and decision makers.<br>What Emily testified to was that for her there was always a "decision-maker" but the other categories of people were not necessarily included in her presentations. |
| 27 | By virtue of promoting medications for the treatment of rare diseases and | **Denied**.<br>The citations do not support the assertion. |

vii

| | | |
|---|---|---|
| | cancer, Plaintiffs came into contact with immunocompromised patients in the offices, healthcare facilities and infusion centers upon which they called. | These assertions cannot be presented in a form that would be admissible in evidence. Objection as to lack of personal knowledge of either McAndrews or O'Loughlin as to how or when Emily or Charlotte ever had personal contact with patients. In fact, the Review Board never investigated or examined that issue regarding possible accommodations. Emily and Charlotte deny they ever had personal contact with patients. Exs. 2 & 3. |
| 28 | These calls are made in-person in doctor's offices and infusion centers at which time Welcome and Grahovac also come into contact with patients and the general public. | **Denied.** The citations do not support the assertion These assertions cannot be presented in a form that would be admissible in evidence. Emily and Charlotte were not contacting either patients or the "general public." See Exs.2 & 3. |
| 29 | In March 2020, COVID-19 forced Amplity's field-based employees, including Welcome and Grahovac, to work remotely because they were no longer permitted to enter the hospital or clinical settings | **Denied.** The citations do not support the assertion. Objection as to the legal conclusion as to the "virus" forcing anything. Facilities chose various ways as to how each would react to it and the testimony states that it was only certain facilities that changed their policies about personal contact as a result of the virus. |
| 30 | In 2020, COVID-19 associated shutdowns required virtually all pharmaceutical sales representatives, including Amplity's field-based colleagues promoting Organon products, to perform the responsibilities of their position remotely. Some clients merely exercised their right to terminate their contracts with Amplity and all Amplity employees assigned to those projects were terminated from employment for that reason. Organon instead allowed Amplity to deploy its field team on a remote basis only until such time as face-to-face interactions with healthcare providers could resume safely. Had Organon terminated its contract at that time, Plaintiffs would have been terminated from Amplity at that time. | **Denied.** Green's statement is inadmissible as not complying with 28 U.S.C. §1746 These assertions cannot be presented in a form that would be admissible in evidence. Objection based on Green's lack of personal knowledge as to "associated shutdowns" and "virtually all pharmaceutical sales" of all companies." Objection as to hearsay and being a legal conclusions "exercised their right to terminate." Objection based upon hypothetical and speculation about Organon's rights or not exercising this right to terminate and the speculation of "if Organon terminated" then Amplity would have fired Emily and Charlotte. Amplity has not provided the Court with any contract with Organon to determine those terms or what rights existed. |

| | | |
|---|---|---|
| | | And Green attempts to controvert fellow board member O'Loughlin who testified the Board didn't review clients or client information. "that was not the purpose of the board." Ex. A ECF 78-19 O'Loughlin, p.70 21-24. p.153:10-15. O'Loughlin admitted the board did not analyze any specifics as to Emily's facilities or clients. p. 155:24:24-p.156:16. |
| 31 | It was not until 2021 that the hospitals and clinics began to open to face-to-face interactions | **Denied** The citation does not support the assertion. These assertions cannot be presented in a form that would be admissible in evidence. Emily did not purport to know what all hospitals and clinics in every county of every state in the nation was doing.  Emily only testified as to what *her* knowledge was in *her* territory – and not even Charlotte's Illinois territory. |
| 32 | Welcome acknowledges that a face-to-face interaction is more effective for her | **Denied** The citation do not support the assertion. Emily did not say she was more effective. Rather, she said "I like it" and that its "motivating." Emily said there were customers that didn't like face to face contact. Ex. 3. |
| 33 | In 2021, as the COVID-19 associated shutdowns began to wane, Organon's competitors were once again engaging in face-to-face meetings with healthcare practitioners and decision makers. Organon made clear to Amplity that it expected Amplity's representatives representing Organon products to be able to also engage again in-person - the service Organon had purchased from Amplity in the first place. | **Denied**. Green's statement is inadmissible as not complying with 28 U.S.C. §1746 These assertions cannot be presented in a form that would be admissible in evidence. Objection as to his lack of knowledge as to "associated shutdowns" "Organon's competitors" "one again" "engaging in face to face meetings with healthcare practioners and decisionmakers" Objection to any foundation for all of those factual assertions. Objection as to hearsay (Organon made clear that it expected…) Objection as to his legal conclusion (Organon had purchased). |
| 34 | Amplity's failure to do so at that time would not have been aligned with Organon's stated expectations. Failing to meet those expectations could have caused Organon exercise its right to terminate the agreement for convenience or to declare Amplity in | **Denied**. Green's statement is inadmissible as not complying with 28 U.S.C. §1746 These assertions cannot be presented in a form that would be admissible in evidence. Objection as to hearsay (Organon's stated expectations) |

ix

| | | |
|---|---|---|
| | material breach of its contractual obligations to Organon. | Objection as to his legal conclusion (would not have been aligned) (failing to meet…would have caused) (Organon to exercise its right) (terminate) (or declare) (breach of material terms) (contractual obligations)<br>Objection as lack of his knowledge speculating about all of this.<br>It is further controverted by O'Loughlin's testimony saying Organon – nor any client – had anything to do with the Amplity vaccine requirement. Ex. A ECF 78-19 p. 47:7-10<br>Q And it's not because clients asked you to do that or told you to do that, you just thought it was a good idea, right?<br>A We worked in -- yes. Yes. Yes.<br>O'Loughlin testified the Board didn't review clients or client information. "that was not the purpose of the board."<br>Ex. A ECF 78-19 O'Loughlin, p.70 21-24. |
| 35 | ¶As a company experienced in providing in-person and remote engagement promotion of pharmaceutical products, Amplity's experience is that in-person engagement is more effective than remote engagement, which is supported by contemporaneous industry research. When all pharmaceutical representatives were engaging remotely due to COVID-19, those that would otherwise have been in the field were on an equal footing with their competitor products. When those representing the competitor products went back to face-to-face promotion, those products that were promoted only remotely were at a clear disadvantage. | **Denied**. Green's statement is inadmissible as not complying with 28 U.S.C. §1746<br>These assertions cannot be presented in a form that would be admissible in evidence.<br>Object as to hearsay (Amplity's experience) (supported by contemporaneous industry research) (with lack of personal knowledge being speculative. ("company experience" "Amplity's experience" "contemporaneous industry research" "equal footing")<br>Object as to lack of personal knowledge on all of the above and as to "all pharmaceutical representatives" and "competitor products" and "went back to face to face" and products at a clear disadvantage.<br>Object as to it being superfluous, conclusory, and argumentative "as a company experienced" and "Amplity's experience" and "equal footing."<br>Object as it purports to be an undesignated expert opinion on all of the above which Green was never designated as and is not an expert.<br>Object to Ex. A. as it is hearsay and never produced in discovery. |
| 36 | At that time, Amplity had discussions with Amplity's customers, including Organon, in which they expressed their expectation that Amplity's field- | **Denied**. Green's statement is inadmissible as not complying with 28 U.S.C. §1746 |

| | | |
|---|---|---|
| | based colleagues resume face-to-face meetings with healthcare practitioners and decision makers as agreed in the relevant contracts. Amplity customers pay 40-50% more for in-person promotion than they do for purely remote promotion. | These assertions cannot be presented in a form that would be admissible in evidence. Object as vague (at that time) (colleagues) Object as hearsay (discussions and they expressed their expectation). Object to the legal conclusion (as agreed and relevant contracts) (pay more for in person) along with lack of personal knowledge.<br><br>It is further controverted in that O'Loughlin testified none of the client contracts had anything to do with the vaccine mandate: Ex. A ECF 78-19 O'Loughlin p.47:7-10 Q And it's not because clients asked you to do that or told you to do that, you just thought it was a good idea, right? A We worked in -- yes. Yes. Yes.<br><br>O'Loughlin testified the Board didn't review clients or client information. "that was not the purpose of the board." O'Loughlin, p.70 21-24. |
| 37 | As of December 2021, about 40 million cases of COVID-19 had been reported. | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and for all of the reasons set forth in the motion to exclude his report. The Review Board did not claim to rely on Dr. Salmon's opinions in 2021 His opinion which also purports to state facts is not material. |
| 38 | Among the 40 million cases of COVID-19 reported as of December 2021, there were approximately 2.9 million hospitalizations and 675,000 deaths. | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and for all of the reasons set forth in the motion to exclude his report. The Review Board did not claim to rely on Dr. Salmon's opinions in 2021 His opinion which also purports to state facts is not material. |
| 39 | Health care staff were at risk of occupational acquired COVID-19 through exposure to infected patients and other health care staff. The Advisory Committee on Immunization Practices (ACIP) of the CDC consequently prioritized healthcare workers for vaccination. | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and for all of the reasons set forth in the motion to exclude his report. The Review Board did not claim to rely on Dr. Salmon's opinions in 2021 His opinion which also purports to state facts is not material. |
| 40 | More than 3,600 healthcare workers died of COVID-19 in the first year of the pandemic. | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and |

| | | for all of the reasons set forth in the motion to exclude his report.<br>The Review Board did not claim to rely on Dr. Salmon's opinions in 2021<br>His opinion which also purports to state facts is not material. |
|---|---|---|
| 41 | Based on the demonstrated efficacy of the Moderna, Pfizer, and J&J COVID-19 vaccines in preventing disease and reducing transmission to others (both by reducing the risk of infection and reducing the viral load if a breakthrough infection) unvaccinated persons were at increased risk of contracting COVID-19 and transmitting it to others who could not be vaccinated. | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and for all of the reasons set forth in the motion to exclude his report.<br>The citation does not support the assertion that it is a current 2024 scientific fact. Objection as it also purports to state a current scientific fact in 2024 when the Report does not assert these conclusions are actually scientifically correct – only that this was what the world thought according to Dr. Salmon.<br>The Review Board did not claim to rely on Dr. Salmon's opinions in 2021<br>His opinion which also purports to state facts that are not material. |
| 42 | Unvaccinated persons have a potential impact on co-workers as unvaccinated persons are at greater risk of contracting and spreading COVID-19 than vaccinated persons | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and for all of the reasons set forth in the motion to exclude his report.<br>The citation does not support the assertion it is a current 2024 scientific fact.<br>Objection as it also purports to state a current scientific fact in 2024 when the Report does not assert these conclusions are actually scientifically correct – only that this was what the world thought according to Dr. Salmon |
| 43 | As with coworkers, unvaccinated persons have a potential impact on patients as unvaccinated persons are at greater risk of contracting and spreading COVID-19 than vaccinated persons. | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and for all of the reasons set forth in the motion to exclude his report.<br>The citation does not support the assertion it is a current 2024 scientific fact.<br>Objection as it also purports to state a current scientific fact in 2024 when the Report does not assert these conclusions are actually scientifically correct – only that this was what the world thought according to Dr. Salmon |
| 44 | Often, patients are at increased risk of serious complications and mortality from COVID-19, depending on their | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and |

| | | |
|---|---|---|
| | medical conditions and age (patients are often older and have more comorbidities than the general population). Additionally, patients and their families have a reasonable expectation that those who are providing them healthcare services are doing everything they can to reduce the potential for the worker to transmit disease to the patient, particularly during a pandemic. | for all of the reasons set forth in the motion to exclude his report. The citation does not support the assertion it is a current 2024 scientific fact. Objection as it also purports to state a current scientific fact in 2024 when the Report does not assert these conclusions are actually scientifically correct – only that this was what the world thought according to Dr. Salmon |
| 45 | During the pandemic, most healthcare facilities had reduced or eliminated elective procedure and routine care to use healthcare capacity for COVID-19 and necessary procedures, and to protect patients and healthcare providers. Thus, when a patient had a necessary procedure, the choices of the patient were limited as the procedure or healthcare visit was necessary and the patient was dependent on the healthcare provider to reduce the risk of transmitting COVID-19. | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and for all of the reasons set forth in the motion to exclude his report. The citation does not support the assertion it is a current 2024 scientific fact. Objection as it also purports to state a current scientific fact in 2024 when the Report does not assert these conclusions are actually scientifically correct – only that this was what the world thought according to Dr. Salmon. The Review Board did not claim to rely on Dr. Salmon's opinions in 2021 His opinion which also purports to state facts is not material. |
| 46 | Amplity serves a diverse range of healthcare facilities and medical offices including those that serve oncology practices. | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and for all of the reasons set forth in the motion to exclude his report. Objection as there is no personal knowledge and being a vaccine doctor does not make him an expert on the overall pharmaceutical sales industry. Salmon admits he was asked not to and did not analyze any specific facilities in his report. |
| 47 | Immunocompromised persons (including those taking immunosuppressants for cancer treatment) are at very high risk for serious complications including death from COVID-19. Consequently, healthcare practices serving cancer patient populations needed to be extremely careful to reduce the risk of transmitting COVID-19 to their patients. Doing so required that their staff and those | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and for all of the reasons set forth in the motion to exclude his report. The citation does not support the assertion it is a current 2024 scientific fact. Objection as there is no personal knowledge and being a vaccine doctor does not make him an expert in cancer or Immunocompromised patients or immunosuppressants. |

| | | |
|---|---|---|
| | entering the medical offices do everything they can to reduce the acquisition and transmission of COVID-19. | Objection as it also purports to state a current scientific fact in 2024 when the Report does not assert these conclusions are actually scientifically correct – only that this was what the world thought according to Dr. Salmon. |
| 48 | Immunocompromised persons (patients with cancer, organ transplant recipients, and those with rheumatological disorders who receive immunosuppressant drugs) were particularly vulnerable to COVID-19 as suppression or over-activation of the immune system was found in studies published early in the pandemic (before December 2021) to have more severe disease and viral shedding among immunocompromised persons. | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and for all of the reasons set forth in the motion to exclude his report.<br>Objection as there is no personal knowledge and being a vaccine doctor does not make him an expert in cancer or Immunocompromised patients or immunosuppressants.<br><br>The citation does not support the assertion it is a current 2024 scientific fact.<br>Objection as it also purports to state a current scientific fact in 2024 when the Report does not assert these conclusions are actually scientifically correct – only that this was what the world thought according to Dr. Salmon.<br>The Review Board did not claim to rely on Dr. Salmon's opinions in 2021<br>His opinion which also purports to state facts is not material. |
| 49 | In addition to vaccination, alternative infection control strategies such as masking, social distancing, and testing had an impact on patients and coworkers. However, these strategies had significant limitations, and the most effective policy to control COVID-19 in healthcare settings was a compressive approach where strategies were combined or layered. | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and for all of the reasons set forth in the motion to exclude his report.<br>The citation does not support the assertion it is a current 2024 scientific fact.<br>Objection as it also purports to state a current scientific fact in 2024 when the Report does not assert these conclusions are actually scientifically correct – only that this was what the world thought according to Dr. Salmon. |
| 50 | The use of masks in healthcare settings to prevent COVID-19 vaccine was based on what was then known regarding mask wearing in healthcare settings to control influenza. However, surgical masks do not work nearly as well as vaccinations which is why the CDC considers influenza | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and for all of the reasons set forth in the motion to exclude his report.<br>Objection as to his unfounded speculation as to what the Board knew and he has no knowledge as to what the world knew.<br>Lack of foundation. |

| | vaccination the first and best way to prevent influenza. | The Review Board did not claim to rely on Dr. Salmon's opinions in 2021 His opinion which also purports to state facts is not material. |
|---|---|---|
| 51 | Regular testing for COVID-19 allows for the identification of persons who have active disease, however, there are limitations to this approach. First, as of December, 2021, available COVID-19 tests were imperfect with the potential for both false positives and false negatives. Additionally, by December, 2021, it had been well-established that people could transmit COVID-19 before becoming symptomatic and among asymptomatic cases. As a consequence, even daily COVID-19 testing would not identify people as soon as they became infectious. In the time between when a person first became infectious and when the test was taken, there was risk that the person would infect others. | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and for all of the reasons set forth in the motion to exclude his report. The citation does not support the assertion it is a current 2024 scientific fact. Objection as it also purports to state a current scientific fact in 2024 when the Report does not assert these conclusions are actually scientifically correct – only that this was what the world thought according to Dr. Salmon. |
| 52 | Social distancing can reduce the transmission of COVID-19, but social distancing is difficult to implement and only has limited (and poorly defined) effectiveness. | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and for all of the reasons set forth in the motion to exclude his report. The citation does not support the assertion it is a current 2024 scientific fact. Objection as it also purports to state a current scientific fact in 2024 when the Report does not assert these conclusions are actually scientifically correct – only that this was what the world thought according to Dr. Salmon. |
| 53 | In December of 2021, three vaccines were available: (1) Moderna COVID-19 vaccine (mRNA-1273); (2) Pfizer and BioNTech COVID-19 vaccine (BNT162b2); and (3) Janssen Biotech COVID-19 vaccine (Ad26.COV2.S). | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and for all of the reasons set forth in the motion to exclude his report. |
| 54 | Using real world data among frontline workers between December 14, 2020 and August 14, 2021 (Delta Wave), full vaccination with COVID-19 vaccines was 80% effective in preventing COVID-19. | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and for all of the reasons set forth in the motion to exclude his report. The citation does not support the assertion it is a current 2024 scientific fact. Objection as it also purports to state a current scientific fact in 2024 when the Report does not assert these conclusions are |

| | | actually scientifically correct – only that this was what the world thought according to Dr. Salmon. |
|---|---|---|
| 55 | COVID-19 vaccines are not live vaccines and cannot cause COVID-19 infection. | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and for all of the reasons set forth in the motion to exclude his report. The citation does not support the assertion it is a current 2024 scientific fact. Objection as it also purports to state a current scientific fact in 2024 when the Report does not assert these conclusions are actually scientifically correct – only that this was what the world thought according to Dr. Salmon. |
| 56 | In 2021 there was no support that being vaccinated against COVID-19 could actually increase transmission. To the contrary, by December 2021, it had been shown that vaccination reduced viral shedding and consequently reduced the likelihood of disease transmission. | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and for all of the reasons set forth in the motion to exclude his report. The citation does not support the assertion it is a current 2024 scientific fact. Objection as it also purports to state a current scientific fact in 2024 when the Report does not assert these conclusions are actually scientifically correct – only that this was what the world thought according to Dr. Salmon. The Review Board did not claim to rely on Dr. Salmon's opinions in 2021 His opinion which also purports to state facts is not material. |
| 57 | The Pfizer and Moderna RNA COVID-19 vaccines produced do not use any fetal cell cultures to manufacture the vaccine. | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and for all of the reasons set forth in the motion to exclude his report. The citation does not support the assertion it is a current 2024 scientific fact. Objection as it also purports to state a current scientific fact in 2024 when the Report does not assert these conclusions are actually scientifically correct – only that this was what the world thought according to Dr. Salmon Objection as Dr. Salmon is not qualified to opine on the development or testing of drugs. |
| 58 | Some COVID-19 vaccines used cells, either in development or in manufacturing, originally isolated from fetal tissues derived from an | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and |

| | | |
|---|---|---|
| | aborted fetus. The fetal cell lines being used to test or manufacture the COVID-19 vaccines are from two sources: (1) HEK-293: A kidney cell line that was isolated from a fetus in 1973; and (2) PER.C6: A retinal cell line that was isolated from a fetus in 1985. | for all of the reasons set forth in the motion to exclude his report.<br>The citation does not support the assertion it is a current 2024 scientific fact.<br>Objection as it also purports to state a current scientific fact in 2024 when the Report does not assert these conclusions are actually scientifically correct – only that this was what the world thought according to Dr. Salmon.<br>Objection as Dr. Salmon is not qualified to opine on the development or testing of drugs. |
| 59 | In neither of these cases was an abortion done for the purposes of harvesting a fetal cell line. These cell lines are used in a vaccine and other drug development as well as manufacturing of some drugs and vaccines because they have been extremely well-characterized over many decades, providing advantages over other cell lines where less in known about them. For example, vaccines for varicella, rubella, hepatitis A, and rabies are made by growing the viruses in fetal cells. | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and for all of the reasons set forth in the motion to exclude his report.<br>The citation does not support the assertion it is a current 2024 scientific fact.<br>Objection as it also purports to state a current scientific fact in 2024 when the Report does not assert these conclusions are actually scientifically correct – only that this was what the world thought according to Dr. Salmon.<br>Objection as Dr. Salmon is not qualified to opine on the development or testing of drugs. |
| 60 | Additionally, many common over the counter drugs were tested on HEK-293 cells or derivative lines including Tylenol/ Acetaminophen; Advil/Motrin/Ibuprofen; Aspirin/ Acety lsalicy lie Acid; Aleve/Naproxen; Pseudoephedrine/Sudafed;Diphenhyd ramine/Benadryl; Tums/Calcium Carbonate; and Pepto-Bismol/Bismuth Subsalicylate. | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and for all of the reasons set forth in the motion to exclude his report.<br>The citation does not support the assertion it is a current 2024 scientific fact.<br>Objection as it also purports to state a current scientific fact in 2024 when the Report does not assert these conclusions are actually scientifically correct – only that this was what the world thought according to Dr. Salmon<br>Objection as Dr. Salmon is not qualified to opine on the development or testing of drugs.<br>Object as the movant's fact is not material. |
| 61 | Common prescription drugs tested on HEK-293 cells or derivative cell lines include: Atorvastatin/Lipitor; Metoprolol/Toprol XL; Omeprazole/Prilosec OTC; Azithromycin I Zithromax; Albuterol/Salbutamol; and Hydroxychloroquine/Plaquenil. | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and for all of the reasons set forth in the motion to exclude his report.<br>The citation does not support the assertion it is a current 2024 scientific fact. |

| | | Objection as it also purports to state a current scientific fact in 2024 when the Report does not assert these conclusions are actually scientifically correct – only that this was what the world thought according to Dr. Salmon<br>Objection as Dr. Salmon is not qualified to opine on the development or testing of drugs. |
|---|---|---|
| 62 | The Centers for Disease Control and Prevention is a federal agency within the Department of Health and Human Services (HSS) and is responsible for protecting the health of the American public. As the premiere public health agency for the country and a model for the rest of the world, the CDC has a long history of expertise in epidemiology and the application of science to control infectious and chronic diseases. | **Denied**. Salmon's statement is inadmissible as not complying with 28 U.S.C. §1746 and for all of the reasons set forth in the motion to exclude his report.<br>The citation does not support the assertion that it is a current 2024 scientific fact.<br>Objection as it also purports to state a current scientific fact in 2024 when the Report does not assert these conclusions are actually scientifically correct – only that this was what the world thought according to Dr. Salmon.<br>The Review Board did not claim to rely on Dr. Salmon's opinions in 2021<br>His opinion which also purports to state facts is not material. |
| 63 | Throughout the COVID-19 pandemic, the CDC issued guidance and recommendations regarding such things as infection prevention and control practices and the benefits of vaccination | **Admitted** that the CDC issued guidance but **Denies** that this document was necessarily the guidance the Review Board actually referred to. |
| 64 | Per the CDC Interim Guideline dated September 21, 2021, "Data from two phase III mRNA vaccine efficacy trials and cohort studies demonstrated up to 95% efficacy following a two-dose vaccination series. It is unknown whether infection confers a similar degree of immunity compared to vaccination. | **Admitted** that this document says this but objects as to hearsay to the truth of the matters asserted.<br>**Denies** that this document was necessarily the guidance the Review Board actually referred to. |
| 65 | Per the CDC Interim Guideline dated October 15, 2021, "COVID-19 vaccines are safe and effective at preventing infection, hospitalization, and death. Most people who get COVID-19 are unvaccinated." | **Admitted** that this document says this but objects as to hearsay to the truth of the matters asserted.<br>**Denies** that this document was necessarily the guidance the Review Board actually referred to. |
| 66 | The CDC Interim Guideline dated October 15, 2021 further stated, "Currently approved or authorized COVID-19 vaccines protect people | **Admitted** that this document says this but objects as to hearsay to the truth of the matters asserted. |

| | | |
|---|---|---|
| | from getting infected and severely ill, and significantly reduce the likelihood of hospitalization and death. Fully vaccinated people are less likely to become infected and, if infected, to develop symptoms of COVID-19 compared with unvaccinated people. Even when fully vaccinated people develop symptoms, they tend to be less severe symptoms than in unvaccinated people. This means they are much less likely to be hospitalized or die than people who are not vaccinated." | **Denies** that this document was necessarily the guidance the Review Board actually referred to. |
| 67 | In its Interim Guidance dated October 15, 2021, the CDC defined "fully vaccinated" against COVID-19 as:<br>• 2 weeks after their second dose in a 2-dose series, such as the PfizerBioNTech or Moderna vaccines, or<br>• 2 weeks after a single-dose vaccine, such as Johnson & Johnson's Janssen vaccine. | **Admitted** that this document says this but objects as to the truth of the matters asserted as hearsay.<br>**Denies** that this document was necessarily the guidance the Review Board actually referred to. |
| 68 | On October 5, 2021, in a continuing commitment to the health and safety of its employees (referred to as colleagues), clients, health care providers and their patients, and in consideration of guidance released by the CDC, Amplity implemented its COVID-19 vaccination policy (the "Vaccination Policy"). | **Denied**.<br>Objection to the reference to "Vaccination Policy" as defined by Amplity.<br>Objection as to hearsay as document is not self-proving as to "Amplity" and its assertions "continuing commitment."<br>Objection as vague as it doesn't identify which guidance from the CDC is referred to.<br>Objection as to hearsay and lack of foundation purporting to assert as truth the reason why Amplity created its vaccine policy.<br>Objection as it recites facts without foundation and it is not self-proving simply because things are stated on that document. |
| 69 | Amplity relied upon the CDC guidance at the time in formulating the Vaccination Policy. | **Denied**.<br>Green's statement is inadmissible as not complying with 28 U.S.C. §1746<br>(Green does not allege that he or anyone on the Review Board actually relied on anything).<br>Objection as McAndrews was not a member of the Review Board and has no personal knowledge as she never attended any Review Board meeting. All of her information about that is from hearsay. |

| | | Ex. B ECF 78-20 (McAndrews) p.31:9-15 |
| --- | --- | --- |
| | | Q. I'm trying to understand. You've seen the document. Did you have any part, then, in requiring -- this idea of requiring vaccination based on role?<br>A. No, I did not make those decisions. That was -- I was executing on the policy. I did not make the decisions.<br>Ex. B ECF 78-20 p.32:6-10<br>Q. It's maybe a good guess, I don't know. But you actually don't know why the 15 didn't have to become fully vaccinated, correct?<br>A. Correct.<br>Ex. B ECF 78-20 p.82:21-23.<br>McAndrews merely guessed at what she thought Amplity was doing.<br>Ex. B ECF 78-20 p. 172:20-p.173:6<br>Q. How do you know?<br>A. How do I know what?<br>Q. You just made the assertion that you think Amplity contacted all these clients and had considered all the varying expectations before they came up with their October 26th decision, that's what you just testified to?<br>A. I think that, yes, we were having conversations with our clients around the expectations, yes.<br>Q. I didn't say having some. I'm saying you assessed all their expectations by October 26th, is that -- how would you know that?<br>A. I don't know that.<br><br>Objection as a legal conclusion about the corporate mind of Amplity being hearsay. As to O'Loughlin the citation does not support the assertions. O'Loughlin can speak for herself. She doesn't identify what guidance from CDC she referred to and she doesn't say which one – which the assertion assumes connecting this CDC document to what O'Loughlin talked about.. |
| 70 | The Vaccination Policy was announced in an email to all Amplity employees on October 5, 2021. | **Denied**. Green's statement is inadmissible as not complying with 28 U.S.C. §1746<br>The assertion is not supported by the citation.<br>Objection as to the use of the nomenclature "Vaccination Policy" being the entirety of the actual policy. It was not a *complete* |

| | | |
|---|---|---|
| | | disclosure. Amplity did not disclose its *complete* Policy informing the employee who requests an accommodation that the employee would automatically forfeit her position and stopped being paid without consideration of the employee's clients, facility requirements, or accommodations a client might provide. |
| 71 | The Vaccination Policy set a December 1, 2021 deadline for US based field colleagues to either provide proof of vaccination or receive approval for an accommodation | **Denied**. Green's statement is inadmissible as not complying with 28 U.S.C. §1746 The citation does not support the assertions. It is controverted as the Review Board set an earlier November deadline for Emily and Charlotte because they were in the Organon contract. Ex. B ECF 78-20 (McAndrews) p. 57¶22-p.58¶12; The Policy did not only apply in the same manner to "core employees." Ex. B ECF 78-20 p. 289¶24-p.290¶24 Ex. A ECF 78-19 (O'Loughlin) p.44¶3-16; p.100 ¶23-p.101¶4; p.104¶10-15; p.105¶14-18; p.107¶12-18; p. 108 ¶16-23. |
| 72 | The Vaccination Policy applied to all "US based field colleagues" that "engage in healthcare facilities and/or client facilities to perform the duties of their job." | **Admitted** that the language exists on the document but **deny** the truth of the matter asserted and object as hearsay. Further deny that this written policy is complete as it was pre-determined before the policy was published that all employees who requested an accommodation would automatically lose their job and be placed on unpaid leave. That was why the Review Board did not need to vote on anything because all of the decision making had already taken place prior to any interactive process. Ex. A ECF 78-19 (O'Loughlin) p. 72: 17-p.73:17 ("There was no voting….Saying there was a vote is explicitly indicating there was an act") That there was an additional part of this policy that was initially concealed: Ex. A ECF 78-19 (O'Loughlin) p.104¶10-15; p.105¶14-18; p.107¶12-18; p. 118¶8-15. p.135¶14-21; p.165¶4-6; p.58¶1-4; p.59¶14-24; p.60¶5-19; p.111¶11-19. |

| | | Ex. B ECF 78-20 (McAndrews) p.122¶5-7; p.197¶9-17; p.270¶15-22; p.145¶6-20; p.150¶7-11. |
|---|---|---|
| 73 | The Vaccination Policy applied only to Amplity employees whose essential functions of their position included regular face-to-face in-person engagements. | **Denied**<br>Object as McAndrews has no personal knowledge.<br>She was not a decision maker in the Review Board.<br>Ex. B ECF 78-20 p.31:9-15.<br>She has no personal knowledge as to what the essential function of Emily or Charlotte's particular job.<br>Object as a legal conclusion as to "essential function."<br>McAndrews admitted she was guessing:<br>Ex. B ECF 78-20 p.32:6-10:<br>Q. Well, that – you're just guessing there. It's maybe a good guess, I don't know. But you actually don't know why the 15 didn't have to become fully vaccinated, correct?<br>A. Correct. |
| 74 | The Vaccination Policy did not apply to all Amplity employees. For example, it did not apply to employees that had a 100% remote position. | **Denied**<br>The Policy applied to all employees but not in the same way to all employees.<br>Ex. B ECF 78-20 (McAndrews) p. 289¶24-p.290¶24<br>Ex. A ECF 78-19 (O'Loughlin) p.44¶3-16; p.100 ¶23-p.101¶4; p.104¶10-15; p.105¶14-18; p.107¶12-18; p.108 ¶16-23. |
| 75 | The Vaccination Policy states,<br>• After December 1, 2021, colleagues who have taken steps to comply with the policy but have not completed the vaccination process may have schedules changed or adjusted, and will be required to comply with | **Admitted** that it states this but **Deny** as to the truth of the matter asserted as hearsay. |

xxii

| | | |
|---|---|---|
| | appropriate protocols as adopted by Amplify or our clients.<br>• After December 1, 2021, colleagues who do not meet requirements of this policy as applicable to their role, will be placed on unpaid leave and their status will be evaluated periodically. | |
| | The Vaccination Policy further states, To assist any employee who has a qualifying medical condition or objects to being vaccinated on the basis of a sincerely held religious belief or practice, we will engage in an interactive process to determine if a reasonable accommodation can be provided that does not create an undue<br>hardship on our business and/or does not pose a direct threat to the health or safety of others in the workplace and/or to the colleague. | **Admitted** that it states this but **Deny** as to the truth of the matter asserted as hearsay. |
| 77 | Amplify made the decision to have its Vaccination Policy apply to its employees that were in the field and engaging with our clients and interacting in healthcare facilities. Amplify primarily supports customers involved in rare diseases and oncology, so there would be immunocompromised individuals in the facilities in which Amplify's employees were visiting | **Denied**.<br>The citations do not support the assertion. These assertions cannot be presented in a form that would be admissible in evidence. Object as hearsay and a legal conclusion that "Amplify made the decision."<br>O'Loughlin has no personal knowledge about Emily or Charlotte or what facilities Emily or Charlotte serviced, or their requirements. O'Loughlin, p. 52:21-25; p. 61:16-17 ("I don't recall any specifics of any particular client at this point in time").<br>It is controverted as the Review Board applied its policy, albeit in a different manner, to core employees who could elect to be tested rather than be vaccine injected. Ex. B ECF 78-20 p. 289¶24-p.290¶24<br>Ex. A ECF 78-19 (O'Loughlin) p.44¶3-16; p.100 ¶23-p.101¶4; p.104¶10-15; p.105¶14-18; p.107¶12-18; p.108 ¶16-23.<br>If the Review Board had investigated at all they would have learned that Emily and Charlotte had no contacts with patients. Plaintiff Exs. 2 & 3 (sworn statements). |
| 78 | When creating the Vaccination Policy, Amplify considered the health and safety of its employees and patients based on CDC guidance and its contractual obligations to provide face | **Denied**.<br>Object as lack of personal knowledge. McAndrews has no personal knowledge of what the Review Board considered. She was |

| | | |
|---|---|---|
| | to-face sales engagements with healthcare providers | not a decision maker and did not participate in the Review Board meetings.<br>Ex. B ECF 78-20 p.15:18 "not my decision"<br>McAndrews did not know but speculated as to why the Review Board did what it did McAndrews knowledge is hearsay coming from Erica Smith.<br>Ex. B ECF 78-20 p.16:13-19<br>Q. And you would know why it created the vaccine policy?<br>A. I wasn't involved in creating the policy, but I -- it was shared to me, kind of the rationale for why we instituted the policy.<br>Q. And who shared that with you?<br>A. That would have been Erica Smith.<br>And Erica Smith had no personal knowledge as she was not on the Review Board<br>Object as hearsay (Amplity considered). |
| 79 | Welcome does not believe that the Vaccination Policy was implemented by Amplity to rid itself of disfavored religious employees. | **Denied**.<br>The citation does not support the assertion.<br>Emily's deposition stated "I don't know."<br>Emily stated "I know that the policy did rid itself of religious employees."<br>Ex. 3 (Emily statement). |
| 80 | Grahovac does not believe that Amplity's intent with the Vaccination Policy was to rid itself of disfavored religious employees. | **Denied**.<br>The citation does not support the assertion.<br>Charlotte is speculating on the Review Board's intent.<br>Ex. C ECF 78-21 (Grahovac) p.45:10-21:<br>A. I believe in the ultimate end anybody who went for a religious accommodation was gotten rid of so to speak from Amplity. Now, whether or not that was because we were religious, I can't say that, but I do know that no one that had a religious accommodation was accommodated.<br>Q. Okay. When you say no one, how would you know that? How would you know whether any religious accommodation was accommodated?<br>A. Because I spoke with other people who also were let go from trying to have a religious accommodation. |
| 81 | Amplity relied upon the CDC guidance to create its COVID-19 Vaccination Policy to aid in the health and safety of its employees and patients | **Denied**.<br>Object as a legal conclusion (Amplity relied upon CDC guidance)<br>The citation does not support the assertion.<br>No one said Amplity had patients. |

| | | |
|---|---|---|
| | | It is controverted in Amplity's EEOC Charge Response stating Emily was fired because she violated the Organon policy.<br>ECF 78-10 (Ex. 13)<br>ECF 78-17 (Ex. 26) (Admissions) para. 42 ("Organon implemented a policy that required all Amplity field based representatives assigned to their contract to be fully vaccinated by November 24, 2021").<br>Green stated the Review Board enacted the Policy to be "competitive."<br>ECF 78-16 (Ex. 25) (Green email)<br>Amplity's interrogatory responses state the reason was for "competitive" reasons.<br>Amplity<br>ECF 83-10, p.5.<br>Objection as to lack of personal knowledge. McAndrews has no personal knowledge.<br>Ex. B ECF 78-20 (McAndrews) p.31:9-15. p.16:13-19<br>O'Loughlin testified the Board didn't review clients or client information. "that was not the purpose of the board." Ex. A ECF 78-19 (O'Loughlin) p.70:21-24. |
| 82 | Based on the CDC guidance in 2021, Amplity believed that unvaccinated employees created a greater risk to themselves or others than unvaccinated employees. | **Denied**.<br>The citation does not support the assertion. McAndrews does not claim this was an "Amplity" belief or a Board belief. McAndrews actually didn't know if it was good information or if it was scientifically correct.<br>Ex. B ECF 78-20 p.66:24-p.67-1. McAndrews in fact disavows making the vaccine policy: p.67:7-12:<br>Q. In terms of what the thought process -- if you're relying on bad science or misinformation, would that have mattered?<br>Mr. Goldblum: Again, same objection. Object to the form of the question.<br>A. I wasn't creating policy at the time.<br><br>Objection as to lack of personal knowledge. Object as to hearsay and speculation as to what "Amplity" or the Review Board believed McAndrews was not on the Review Board and has no personal knowledge.<br>Ex. B ECF 78-20 p.31:9-15. p.16:13-19. |

| 83 | Based on guidance from the CDC at the time, including regarding the reduction of the spread of COVID-19 infections, minimization of the effects of the COVID-19 virus, and the use of FDA approved vaccines, it was determined that allowing Welcome and Grahovac to work unvaccinated in a field-based representative role would place the health care advisors visited and their patients in the practice at risk by other immunocompromised persons were present. Amplity determined that this risk was too great and could place all of Amplity's customer relationships and customer contracts in jeopardy. It was believed at that time that this could have literally put an end to Amplity's business exposing them to COVID-19 | **Denied**. Green's statement is inadmissible as not complying with 28 U.S.C. §1746 Objection as to vagueness ("It" in "it was determined"). Objection as to foundation and personal knowledge (determined by who, how, and when?) Object as to hearsay (Amplity believed)<br><br>Further controverted in ECF 83-10 (Interrogatory response) which provided reasons. Further controverted in the EEOC Charge Response ECF 78-10 (Ex. 13) ECF 78-17 (Ex. 26) (Admissions) para. 42 ("Organon implemented a policy that required all Amplity field based representatives assigned to their contract to be fully vaccinated by November 24, 2021"). |
| --- | --- | --- |
| 84 | Based on what was known about COVID-19 at the time, Amplity was concerned that if Amplity's employees were spreading COVID-19, making people sick or even killing people, it would have put Amplity and its clients at risk of liability for allowing unvaccinated representatives into healthcare provider facilities where, by definition, patients with cancer and other immunocompromised persons were present. Amplity determined that this risk was too great and could place all of Amplity's customer relationships and customer contracts in jeopardy. It was believed at that time that this could have literally put an end to Amplity's business | **Denied**. Green's statement is inadmissible as not complying with 28 U.S.C. §1746 Objection as to hearsay (what was known) Object as vague as to what was known (by who?) Object as speculation as to what was known Object as speculating as to what was believed, whether correct or not, would spread Covid. Object as to foundation and personal knowledge (when and how?) Object as a legal conclusion and speculation (Amplity concerned) Object as speculating as to patients (by definition) and whether Emily or Charlotte had any contact with patients. "In jeopardy" is hypothetical and speculation and a legal conclusion. "It was believed" is hearsay and vague. "Put an end to Amplity's business" is speculation and Green has no personal knowledge about that self-serving statement. It is further controverted that it claimed the real reason for vaccine mandate was to be competitive and that Organon required Emily and Charlotte to be vaccinated. Ex. 83-10 (Interrogatory response) which provided reasons. |

| | | |
|---|---|---|
| | | Further controverted in the EEOC Charge Response<br>ECF 78-10 (Ex. 13)<br>ECF 78-17 (Ex. 26) (Admissions) para. 42 ("Organon implemented a policy that required all Amplity field based representatives assigned to their contract to be fully vaccinated by November 24, 2021"). |
| 85 | For these reasons, Amplity determined that it could not allow any employees to visit doctors' offices unless they were vaccinated, whether their request for exemption from the COVID-19 vaccine requirement was made for religious, medical, political, or any other reasons. To the extent available, Amplity sought to place anyone who did not want the vaccine for any reason into purely remote engagement roles that did not require a vaccine. Unfortunately, there was not as many of those roles available as there were people who may have wanted them | **Denied**. Green's statement is inadmissible as not complying with 28 U.S.C. §1746<br>Objection as legal conclusion and hearsay ("Amplity determined" "Amplity sought")<br>"For these reasons" is controverted by the other stated reasons Amplity gave:<br>Ex. 83-10 (Interrogatory response) which provided reasons.<br>Further controverted in the EEOC Charge Response<br>ECF 78-10 (Ex. 13)<br>ECF 78-17 (Ex. 26) (Admissions) para. 42 ("Organon implemented a policy that required all Amplity field based representatives assigned to their contract to be fully vaccinated by November 24, 2021")<br>Lack of foundation<br>Green stated a competitive reason. Ex. 25<br>Object as argumentative ("unfortunately"). |
| 86 | The Policy also took into consideration that Amplity's contracts with its customers provided for face-to-face sales. | **Denied**. Object as McAndrews has no personal knowledge about what the Review Board considered. Her purported knowledge is all derived from hearsay – she has no personal knowledge.<br>Ex. B ECF 78-20 p.31:9-15.<br>p.16:13-19<br>Ex. A ECF 78-19 (O'Loughlin), p. 52:21-25; p. 61:16-17 ("I don't recall any specifics of any particular client at this point in time").<br>O'Loughlin said no specific clients or facilities were considered and no specific contracts were analyzed. O'Loughlin testified the Board didn't review clients or client information. "that was not the purpose of the board." O'Loughlin, p.70 21-24. |
| 87 | In early 2022 more and more medical offices were opening and allowing face-to face meetings with doctors, which are more productive than virtual meetings. Further, Amplity's competitors were having face-to-face | **Denied**.<br>These assertions cannot be presented in a form that would be admissible in evidence. Objection as McAndrews has no personal knowledge and is speculating. She has no |

| | | |
|---|---|---|
| | meetings, so to remain competitive and have a higher likelihood of a sale, face-to-face engagements were the preference. | personal knowledge about any "competitors" or any medical offices practices. Ex. B ECF 78-20 p.31:9-15; p.16:13-19. Objection as vague and speculation as to whose "preference" she is referring to. Object as contains legal conclusions about contract requirements (which she has no personal knowledge of and is not in her job description anyway). Not demonstrated how McAndrews has any personal knowledge about any of these vague broad assertions. Ex. B ECF 78-20 p.50:14-20. |
| 88 | Amplity was contractually obligated to provide a field-based team of employees its Statement of Work with customers required field-based sales representatives, not remote representatives. | **Denied**. These assertions cannot be presented in a form that would be admissible in evidence. Objection as a legal conclusion (Amplity was contractually obligated) Her contract interpretation is a legal conclusion Objection as McAndrews has no personal knowledge about this. Ex. B ECF 78-20 p.50:14-20; p.31:9-15; p.16:13-19. Ex. A ECF 78-19 (O'Loughlin), p. 52:21-25; p. 61:16-17 ("I don't recall any specifics of any particular client at this point in time"). O'Loughlin testified the Board didn't review clients or client information. "that was not the purpose of the board." O'Loughlin, p.70 21-24. |
| 89 | Amplity's contracts with customers required it to provide field-based employees to have in-person meetings and hospital systems, health systems and oncology centers required vaccination in order to enter those locations. | **Denied**. These assertions cannot be presented in a form that would be admissible in evidence. Objection as a legal conclusion (Amplity's contracts with customers required it to provide). McAndrews does not have personal knowledge as to all of Amplity's contracts and even if she did she is not an expert and her contract interpretations are speculation and legal conclusions. Ex. B ECF 78-20 p.50:14-20; p.31:9-15; p.16:13-19. Ex. A ECF 78-19 (O'Loughlin), p. 52:21-25; p. 61:16-17 ("I don't recall any specifics of any particular client at this point in time"). |

| 90 | Organon required Amplity field-based colleagues representing their products to be to be vaccinated by November 24, 2021 | **Denied**. The citation does not support the assertion. These assertions cannot be presented in a form that would be admissible in evidence. There is no Amplity 61-62 (Ex. 4) (ends at 62 starts 131). Objection as hearsay and a legal conclusion ("Organon required") McAndrews has no personal knowledge of this. Ex. B ECF 78-20 p.59:9-12; p.50:14-20; p.31:9-15; p.16:13-19. The citation to Grahovac deposition 42:22-43:2 is hearsay. She has no personal knowledge and heard it "communicated to you" which is hearsay (she said she doesn't know). Neither Emily nor Charlotte had any direct communications with Organon in which to have any knowledge. Exs. 2 & 3. As to the citation to Emily, she said she didn't know. ECF 78-22 (Welcome) p.101:25-102:10. Oloughlin directly controverts this assertion: Ex. A ECF 78-19 p. 47:7-10 Q And it's not because clients asked you to do that or told you to do that, you just thought it was a good idea, right? A We worked in -- yes. Yes. Yes. |
| --- | --- | --- |
| 91 | Allowing Welcome and Grahovac to work in their positions unvaccinated put the Organon contract at risk because Organon required its employees and representatives to be vaccinated and was expecting Amplity employees representing Organon products be vaccinated as well. | **Denied**. Green's statement is inadmissible as not complying with 28 U.S.C. §1746<br><br>Object as a legal conclusion ("put the Organon contract at risk because Organon required" "was expecting Amplity employees"). Object as hearsay and the lack of personal knowledge. In fact, the Review Board never contacted Organon to ascertain what its position was, there is no evidence that Organon ever threatened a breach McAndrews admitted this to Charlotte "I know of one client that – and it wasn't Organon – that we want vaccinated people on the contract.. if you're not able to provide that then we're going to pull the contract. But I did hear about accommodating one person even in that contract.": |

| | | Plaintiffs' Ex. 3 (Charlotte statement) |
|---|---|---|
| 92 | Karen McAndrews is the Director of Human Resources Business Partner Team | **Admitted** |
| 93 | Per Becky O'Loughlin, Amplity's former Chief People Officer, the Vaccination Policy required vaccinations for Amplity field based employees, particularly those that could come in contact with immunocompromised individuals, "We made the decision of our COVID vaccination for those that were going to be engaging in the field with our clients interacting in healthcare facilities, interacting -- we primarily support rare disease and oncology so there would be immunocompromised, could be immunocompromised individuals that would be in these facilities that we would be in and out of." | **Denied**. Object as legal argument that the "Vaccine Policy" emphasized or prioritized these things. Object as containing hearsay statements. Object as lacking personal knowledge as O'Loughlin had no personal knowledge as to any of Emily's or Charlotte's facilities. Ex. A ECF 78-19 p. 52:21-25; p. 61:16-17 ("I don't recall any specifics of any particular client at this point in time"). O'Loughlin testified the Board didn't review clients or client information. "that was not the purpose of the board." O'Loughlin, p.70 21-24. Emily and Charlotte were never in contact with patients. Exs. 2 & 3. It is further controverted because Amplity gave different reasons for its vaccine policy: ECF 83-10 (Interrogatory response) which provided reasons. Further controverted in the EEOC Charge Response ECF 78-10 (Ex. 13) (Charge Response) ECF 78-17 (Ex. 26) (Admissions) para. 42 ("Organon implemented a policy that required all Amplity field based representatives assigned to their contract to be fully vaccinated by November 24, 2021") Lack of foundation Green stated a competitive reason. Ex. 25. |
| 94 | Amplity decided its Vaccination Policy required vaccinations for anyone that was going to be in and out of client facilities, healthcare facilities, doctors' offices | **Denied**. Object as lack of personal knowledge. McAndrews has no personal knowledge of what the Review Board considered. She was not a decision maker and did not participate in the Review Board meetings. Ex. B ECF 78-20 p.15:18 "not my decision" McAndrews did not know but speculated as to why the Review Board did what it did McAndrews knowledge is hearsay coming from Erica Smith. Ex. B ECF 78-20 p.16:13-19. |

| | | Q. And you would know why it created the vaccine policy?<br>A. I wasn't involved in creating the policy, but I -- it was shared to me, kind of the rationale for why we instituted the policy.<br>Q. And who shared that with you?<br>A. That would have been Erica Smith.<br>And Erica Smith had no personal knowledge as she was not on the Review Board. |
|---|---|---|
| 95 | If a field-based employee did not comply with the Vaccination Policy, Amplity would attempt to accommodate them in a remote role where no vaccination was necessary | **Denied**.<br>Object as to the legal conclusion (Amplity would attempt)<br>The Review Board never attempted to accommodate Emily or Charlotte as it was predetermined they would lose their jobs, be placed on unpaid leave and then were offered remote positions that required vaccinations or that would pay about ½ of their salary.<br>Ex. A ECF 78-19 (O'Loughlin), p.104¶10-15; p.105¶14-18; p.107¶12-18; p. 118¶8-15.<br>O'Loughlin p.135¶14-21; p.165¶4-6; p.58¶1-4; p.59¶14-24; p.60¶5-19; p.111¶11-19.<br>Ex. B ECF 78-20 (McAndrews) p.122¶5-7; p.197¶9-17; p.270¶15-22; p.145¶6-20; p.150¶7-11.<br>Exs. 2 & 3 |
| 96 | Amplity's Vaccination Policy was consistent with other companies in the industry. Following their termination, both Welcome and Grahovac were hindered in their attempts to secure new employment because the companies to which they were applying had a COVID-19 vaccination requirement similar to Amplity | **Denied**.<br>These assertions cannot be presented in a form that would be admissible in evidence.<br>Objection as "consistent" is a legal conclusion.<br>The citations do not support the assertion<br>Neither Emily nor Charlotte purport to be experts about all other companies in the industry.<br>Their experience was limited and eventually became employed by companies that did not require vaccinations.<br>Welcome p. 128:16-18 (employed by AbbVie)<br>Grahovac p.80:19-23 (employed by TerSera Therapeutics)<br>Object as to speculation as to "other companies in the industry" which is not supported from the citation. |
| 97 | Amplity had an Exemption Review Board that reviewed all requests for exemptions from the Vaccination Policy. The Exemption Review Board was comprised of Becky O'Loughlin | **Denied**.<br>Green's statement is inadmissible as not complying with 28 U.S.C. §1746 |

| | | |
|---|---|---|
| | (former Chief People Officer), Eric Green (General Counsel) and Torben Colberg (former Chief Medical Officer) | Objection as the interrogatories are hearsay and inadmissible.<br>Object as to lack of personal knowledge by McAndrews. She has no personal knowledge of what the Review Board considered and received her information from Erica Smith who purportedly received it from the Review Board. McAndrews, p.59:9-12; McAndrews p.50:14-20; p.31:9-15; p.16:13-19.<br>It is further controverted that the Review Board actually reviewed any requests as it made all of its decision prior to the policy being published – that all requesting employees would lose their job and be placed on unpaid leave. There was no decisions to be made and why no vote was ever taken later.<br>Ex. A ECF 78-19 (O'Loughlin) p. 72: 17-p.73:17 ("There was no voting….Saying there was a vote is explicitly indicating there was an act"). |
| 98 | Consequently, the Exemption Review Board brought to it significant experience, training and education in medicine, law and human resources. Each of these trained professionals were senior executives of the company that brought their respective knowledge, background, experience, training, education and common sense to the Exemption Review Board, which qualified it to consider requests for exemptions from the Vaccination Policy. | **Denied**.<br>Objection as the response to interrogatories is hearsay and inadmissible.<br>Objection as to the legal and argumentative conclusions (significant experience, training and education) (trained professionals) (respective knowledge background experience training education and common sense).<br>Objection as to the interrogatory answer's personal knowledge of all of these things. |
| 99 | The Exemption Review Board met periodically to discuss employees' requests for exemption from the Vaccination Policy. At such meetings, each request was reviewed, discussed and a determination regarding the exemption was made, based upon the specific facts and information relevant to the request for exemption provided by the employee | **Denied**. Objection as to hearsay. The Interrogatories do not demonstrate personal knowledge and are inadmissible.<br>There were no decisions made on specific facts<br>The decision was predetermined and a one-size fits all. There was never any case by case analysis.<br>Ex. A ECF 78-19 (O'Loughlin), p.104¶10-15; p.105¶14-18; p.107¶12-18; p. 118¶8-15. O'Loughlin p.135¶14-21; p.165¶4-6; p.58¶1-4; p.59¶14-24; p.60¶5-19; p.111¶11-19.<br>Ex. B ECF 78-20 (McAndrews) p.122¶5-7; p.197¶9-17; p.270¶15-22; p.145¶6-20; p.150¶7-11. |

| | | There was no decisions to be made and why no vote was ever taken later. Ex. A ECF 78-19 (O'Loughlin) p. 72: 17-p.73:17 ("There was no voting....Saying there was a vote is explicitly indicating there was an act") |
|---|---|---|
| 100 | The Exemption Review Board engaged in discussions pursuant to which it made the determination regarding what employees posed a direct threat to the health or safety of others in the workplace and/or determined whether a reasonable accommodation could be made without undue hardship to Amplity. This process was followed for all employees' requests for exemption from the Vaccination Policy, whether medical, religious or otherwise. | **Denied.** Green's statement is inadmissible as not complying with 28 U.S.C. §1746<br><br>Objection as to "it made a determination" is hearsay<br>It is further denied that the Review Board engaged in any contemporaneous hardship analysis as it was already pre-determined, before any request, that upon a request for an accommodation the employee would forfeit her job, and then be placed on unpaid leave status.<br>It was all predetermined and the Review Board did not consider or otherwise engage in any discussions that required any decision as everything was set in stone<br>O'Loughlin p. 72: 17-p.73:17 ("There was no voting....Saying there was a vote is explicitly indicating there was an act").<br>O'Loughlin, p.104¶10-15; p.105¶14-18; p.107¶12-18; p. 118¶8-15.<br>O'Loughlin p.135¶14-21; p.165¶4-6; p.58¶1-4; p.59¶14-24; p.60¶5-19; p.111¶11-19.<br>McAndrews p.122¶5-7; p.197¶9-17; p.270¶15-22; p.145¶6-20; p.150¶7-11. |
| 101 | Further, the Exemption Review Board considered the information and guidance that was issued by the CDC including but not limited to regarding the reduction of the spread of COVID-19 infections, minimization of the effects of the COVID-19 virus, and the use of FDA approved vaccines. | **Denied.**<br>**Denied.** Green's statement is inadmissible as not complying with 28 U.S.C. §1746<br>Object as the interrogatory responses are hearsay and inadmissible.<br>Object to the vague language "included but not limited to." |
| 102 | The Exemption Review Board's determination was communicated to human resources personnel, which then communicated the determination to the employee. If supplemental information or documents were provided by an employee, such information or documents was also provided to the Exemption Review Board for consideration. This process was followed for all employees' | **Denied.**<br>Object as hearsay as to the interrogatory responses for the reasons set forth in the motion to strike.<br><br>Object as vague to the language "determination was communicated to human resources personnel" and also as hearsay, and "communicated to the employee" as double hearsay. |

xxxiii

| | | |
|---|---|---|
| | requests for exemption from the Vaccination Policy, including Welcome and Grahovac | Object as it is speculative and lacks personal knowledge ("*if* information was provided"). There was no interactive process and no decision making after the vaccine mandate was published. <br> Ex. A ECF 78-19 (O'Loughlin) p. 72: 17-p.73:17 ("There was no voting....Saying there was a vote is explicitly indicating there was an act"). |
| 103 | The ERB did not engage in.an evaluation of the sincerity of an employee's sincerely held religious belief. | **Denied**. <br> Objection as vague to the term "ERB" which is unknown. <br> It is controverted as McAndrews sent both requests of Emily and Charlotte were denied because McAndrews said the Board did not believe either met the sincere religious belief criteria. <br> McAndrews emailed Emily on November 22, 2021, specifically stating <br> "To be eligible for an exception, you must first establish that your refusal to be vaccinated is based upon a sincere belief that is religious in nature. At this □me, the Exemption Review Board does not believe this criteria was met." ECF 78-15 (Ex. 24)(Emily's denial); ECF 78-9 (Ex. 12)(Charlotte denial). <br> McAndrews communicated the identical message to Ms. Isensee who was also a Field Base Sales person assigned to the Organon contract. ECF 78-8 (Ex. 11) (Isensee email from McAndrews); ECF 78-5 (Ex.6) (McAndrews deposition in Isensee). p.33¶15-p.34 ¶22. According to McAndrews, the Review Board rejected Emily's and Charlotte's initial religious accommodation request stating it did not satisfy and more information was needed to "close this gap." Ex. B ECF 78-20 (McAndrews) p.134¶13-18. |
| 104 | The sincerity of Welcome and Grahovac's religious beliefs was no factor whatsoever in the decision regarding their request for an accommodation from the Vaccination Policy. | **Denied**. <br> McAndrews emailed Emily on November 22, 2021, specifically stating <br> "To be eligible for an exception, you must first establish that your refusal to be vaccinated is based upon a sincere belief that is religious in nature. At this time, the Exemption Review Board does not believe this criteria was met." |

| | | ECF 78-15 (Ex. 24)(Emily's denial); ECF 78-9 (Ex. 12)(Charlotte denial) McAndrews communicated the identical message to Ms. Isensee who was also a Field Base Sales person assigned to the Organon contract. ECF 78-8 (Ex. 11) (Isensee email from McAndrews); ECF 78-5 (Ex.6) (McAndrews deposition in Isensee). p.33¶15-p.34 ¶22. According to McAndrews, the Review Board rejected Emily's and Charlotte's initial religious accommodation request stating it did not satisfy and more information was needed to "close this gap." Ex. B ECF 78-20 (McAndrews) p.134¶13-18; |
|---|---|---|
| 105 | Amplity attempted to find an alternative position for every Amplity employee that sought a request for an accommodation from the Vaccination Policy. This was done whether the request was based upon religious or medical reasons. | **Denied.** Object as vague as to "alternative position." It is controverted as at no time did the Review Board consider offering Emily or Charlotte a position with similar salary and benefits while remaining true to their religious convictions regarding not consenting to the covid-19 vaccine injections. This assertion is also admits that once the employee made a request, she would automatically lose her position and be placed on unpaid leave – with the Review Board needing no further decision making process. O'Loughlin admitted that offering Emily or Charlotte a position that still required vaccination was not an accommodation. The Review Board determined that it was a reasonable accommodation for the employee's salaried position to be forfeited, then be placed on unpaid leave, then have the employee wait for a 100% remote position that paid $40,000 less than the Field Based salary. Ex. B ECF 78-20 p.190 ¶4-23; p.195 ¶8-16 Ex. A ECF 78-19 (O'Loughlin) p.149:5-12. ("It doesn't sound like an accommodation"). p.150:3-14 ("It's not an accommodation... It's not a reasonable accommodation"). |
| 106 | Amplity employees, including Welcome and Grahovac, were terminated for not following Amplity's Vaccination Policy, not because they didn't follow the vaccination policies of Amplity's customers. | **Denied.** McAndrews said that the fully vaccinated requirement put upon Emily and Charlotte was because Organon required it. Ex. B ECF 78-20 p.57¶22-p.58¶12; |

| | | ECF 78-15 (Ex. 24)(Emily's denial). McAndrews said as of "November 24, Organon requires vaccination of Amplity employees." Ex. 24. ECF 78-10 (Ex. 13)(charge response) ECF 78-17 (Ex. 26) (Admissions) para. 42 ("Organon implemented a policy that required all Amplity field based representatives assigned to their contract to be fully vaccinated by November 24, 2021") |
|---|---|---|
| 107 | The Exemption Review Board reviewed applications to understand who was requesting accommodations, did they complete the request consistently, did the company have anything for the employee to consider as an accommodation through identification of remote opportunities. | **Denied**. The Review Board had already pre-determined what the consequences to every employee requesting an accommodation. There were no decisions left for the Board to make and they never voted – or had the need to vote O'Loughlin p. 72: 17-p.73:17 ("There was no voting….Saying there was a vote is explicitly indicating there was an act") The Review Board predetermined, before any request and any interactive process, what would be the consequence to every employee requesting an accommodation which would be the forfeiture of their position and placement on unpaid leave. Ex. A ECF 78-19 (O'Loughlin), p.104¶10-15; p.105¶14-18; p.107¶12-18; p. 118¶8-15. O'Loughlin p.135¶14-21; p.165¶4-6; p.58¶1-4; p.59¶14-24; p.60¶5-19; p.111¶11-19. Ex. B ECF 78-20 (McAndrews) p.122¶5-7; p.197¶9-17; p.270¶15-22; p.145¶6-20; p.150¶7-11. |
| 108 | Grahovac submitted her request for a religious exemption to the Vaccination Policy on October 28, 2021. | **Admit** |
| 109 | Welcome submitted her request for a religious exemption to the Vaccination Policy on November 8, 2021. | **Denied** that Amplity 131 is Emily's request. The actual request was attached but is omitted in Amplity 131. |
| 110 | On November 23, 2021, Welcome submitted additional information in support of her exemption request. | **Denied** that this was "in support" as the information was submitted after her request had been denied. McAndrews emailed Emily on November 22, 2021, specifically stating "To be eligible for an exception, you must first establish that your refusal to be vaccinated is based upon a sincere belief that is religious in nature. At this time, the Exemption Review Board does not believe |

| | | this criteria was met." ECF 78-15 (Ex. 24)(Emily's denial). |
|---|---|---|
| 111 | On November 12, 2021, Grahovac was informed that Amplity was not able to provide her with a reasonable accommodation in her role as Biosimilar Account Specialist. | **Denied**. There is no Amplity 376 (ends 258 - starts 379).<br>Object as vague (was informed) (by who or when?).<br>Object to "reasonable accommodation" as argumentative and a legal conclusion. |
| 112 | In the November 12, 2021 correspondence to Grahovac, Amplity stated:<br>• The Biosimilar Account Specialist role requires regular in-person engagements with HCPs in medical offices and facilities to successfully perform in the job. Engaging in these interactions unvaccinated and on behalf of the company puts you and the company at great risk.<br>• Targets in the role's territory require vaccination now or will require in the near future to access. These in-person visits are the primary mission of the company, and to avoid those visits would change the fundamental nature of the company and its services - leading to an undue hardship on Amplity.<br>• In addition, effective November 24, Organon requires vaccination of Amplity employees representing their product before calling on health care facilities and physicians' offices. | **Denied**.<br>There is no Amplity 151 (ends 131 and starts 195).<br>Object to "Amplity stated" is a legal conclusion and hearsay.<br>Object as hearsay and a legal conclusion as to "Organon requires vaccination of Amplity employees."<br>Object as to lack of personal knowledge.<br>On the one hand Amplity says it didn't know whether Organon instituted a vaccine policy applicable to Organon employees.<br>In response to the statement "Organon instituted a policy requiring its employees to be "fully vaccinated" by November 24, 2021," Amplity stated it was unknown.<br>ECF 78-17 (Ex. 26) ¶41<br>In response to the statement "Organon's Covid 19 vaccination policy did not include third parties such as Emily Welcome" Amplity stated it was unknown whether Organon's formal vaccination policy included third-parties such as Ms. Welcome." Ex. 26, ¶42. |
| 113 | On November 22, 2021, Welcome was informed that Amplity was not able to provide her a reasonable accommodation in her role as Biosimilar Account Specialist. | **Denied**. There is no Amplity 151<br>Object as argumentative and a legal conclusion regarding "reasonable accommodation"<br>Object as hearsay and speculation. |
| 114 | In the November 22, 2021 correspondence to Welcome, Amplity stated:<br>• The Biosimilar Account Specialist role requires regular in-person engagements with HCPs in medical offices and facilities to successfully perform in the job. Engaging in these interactions unvaccinated and on behalf of the company puts you and the company at great risk. | **Denied**. There is no Amplity 151<br>Object as it is hearsay as to the truth of the matter asserted and speculation.<br>Object as to a lack of foundation for the speculative assertions about "targets" which is also vague. |

| | | • Targets in the role's territory require vaccination now or will require in the near future to access. These in-person visits are the primary mission of the company, and to avoid those visits would change the fundamental nature of the company and its services - leading to an undue hardship on Amplity.<br>• In addition, effective November 24, Organon requires vaccination of Amplity employees representing their product before calling on health care facilities and physicians' offices. | |
|---|---|---|---|
| 115 | On or about November 22, 2021, Grahovac informed Karen McAndrews that she intended to get vaccinated, and then subsequently informed Ms. McAndrews that she had changed her mind | **Denied**<br>The citation does not support the assertion. Ms. Grahovac did not state she intended to get vaccinated. She stated she was conflicted about whether to make that decision at all:<br>I talked to Karen McAndrews at some point. It could have been November 22nd because it was nearing Thanksgiving time. And we had a conversation with a lot tears and a lot anguish from me because I didn't want to get a vaccine. That's why I asked for a religious exemption because I didn't want it in my body. I didn't believe in it, and I was being forced to choose between my job and my relationship with God and what I truly believe in my heart. So, yes, very conflicting, very difficult. But being the sole bread winner at the moment in my family, I needed to make a decision about what I was going to do.<br>Q. And then ultimately, as you explained a few minutes ago, you ended up getting some type of respiratory ailment. And then at some point did you then notify Ms. McAndrews that you were not going to get vaccinated?<br>A. We touched base. We had other conversations and I told her I'm not going to do this. |
| 116 | Grahovac is not aware of any Amplity field-based employees that were permitted to remain in their position unvaccinated | **Denied**<br>Object as vague as to who is doing the permitting and whether "colleagues" only means Amplity employees.<br>It is controverted as Charlotte said she was aware of Organon permitting employees to remain in their positions. |

| | | |
|---|---|---|
| | | ECF 78-21 (Grahovac) p.78:19-p.79:5 Q. You're not aware of any US field-based colleagues that were permitted to remain employed by Amplity unvaccinated, are you? A. Only through Organon, not Amplity employees. Q. And that was whether or not they asked for religious exemption, right? A. No. No. It was people that had asked for religious exemptions through Organon because they were an employee of Organon. They were granted the opportunity to either test or do whatever they needed to do in order to keep their job. |
| 117 | Amplity took active steps to locate fully-remote positions for Plaintiffs as a way to accommodate their requests for exemption from the Vaccination Policy. | **Denied.** Nothing is the email chain refers to Charlotte. Object to "active steps" and "as a way to accommodate" is argumentative and a legal conclusion. The cited email chains between Blackwell Feola and McAndrews are objected to as hearsay. It is further controverted as the only located position had the same vaccine requirement paying $40,000 less to Emily. Ex. B ECF 78-20 p.190 ¶4-23; p.195 ¶8-16 Ex. A ECF 78-19 (O'Loughlin) p.149:5-12. ("It doesn't sound like an accommodation"). p.150:3-14 ("It's not an accommodation… It's not a reasonable accommodation"). |
| 118 | Further, for Amplity positions that were primarily remote, but had an occasional in-person training or meeting, Plaintiffs could have been granted an accommodation that would allow them to not attend that meeting or be accommodated in another way. | **Denied.** The citation does not support the assertion. McAndrews referred to 100% remotes that required vaccination but did not remember specifically whether any remotes were offered that did not require vaccinations. Object as lack of personal knowledge and speculation as to what McAndrews was predicting. She was not a decisionmaker on the Review Board. Ex. B ECF 78-20 p.31:9-15. |
| 119 | Welcome rejected the alternative positions that were presented to her by Amplity because, as remote positions, they paid less than a field-based representative position. | **Denied.** Object as argumentative to "the alternative positions" There were no plural "positions" offered to Emily and the one that did not require vaccination and paid half of her salary. |

| | | |
|---|---|---|
| | | Ex. B ECF 78-20 p.190 ¶4-23; p.195 ¶8-16<br>Ex. A ECF 78-19 (O'Loughlin) p.149:5-12. ("It doesn't sound like an accommodation").<br>p.150:3-14 ("It's not an accommodation… It's not a reasonable accommodation"). |
| 120 | After her termination, Grahovac was contacted by Amplity and asked to interview for a position with a different Amplity customer (not Organon), and she had two separate interviews, but did not get the position. | **Admit** |
| 121 | Amplity believed that allowing field-based employees, including Welcome and Grahovac, to engage in face-to-face interactions unvaccinated created an undue hardship for Amplity, which included the following:<br>• If Amplity's employees were spreading COVID-19, making people sick or even killing people, it put at risk all of Amplity's customer relationships and customer contracts. This could have literally put an end to Amplity's business.<br>• Allowing Welcome and Grahovac to work in their positions unvaccinated put the Organon contract at risk. Organon required its employees and representatives to be vaccinated.<br>• Amplity's contracts (including the Organon contract) requires face-to-face meetings. Failing to do so put the Organon contract at risk.<br>• Organon's competitors were again having face-to-face meetings at that time. Amplity representatives like Plaintiffs not doing so would put Organon at a competitive disadvantage to its competitors and lead to Organon's dissatisfaction with the service being provided by Amplity.<br>• Based on the CDC guidance at that time, including regarding the reduction of the spread of COVID-19 infections, minimization of the effects of the COVID-19 virus, and the use of FDA approved vaccines, allowing Welcome and Grahovac to work unvaccinated in a field-based representative role would have placed Amplity's other employees and the | There was an Interrogatory 8 response but for purposes of Amplity's attempted affirmative use of it, the Interrogatory responses are inadmissible hearsay as set out in the motion to strike.<br>These assertions cannot be presented in a form that would be admissible in evidence. Object as hearsay to the truth of the matters asserted with its legal conclusions and therefore it is **Denied** for purposes of this summary judgment motion only. |

xl

| | | |
|---|---|---|
| | public at large at risk by exposing them to COVID-19. | |
| 122 | Amplity considered it an undue hardship to be unable to fulfill the contractual requirements of its clients | Object to "Amplity considered" as a legal conclusion, speculation, and hearsay. Object as O'Loughlin has no personal knowledge of the contracts of each client and she specifically testified the Review Board never considered any clients. O'Loughlin testified the Board didn't review clients or client information. "that was not the purpose of the board." Ex. A ECF 78-19 (O'Loughlin) p.70:21-24.<br><br>A I'm telling you what we reviewed. We did not review clients. We did not review client information in the review board. That was not the purpose of the review board. |
| 123 | ¶ Based on what was known about COVID-19 at the time, Amplity was concerned that if its employees were spreading COVID-19, making people sick or even killing people, it would have put Amplity and its clients at risk of liability for allowing unvaccinated representatives into healthcare provider facilities where, by definition, patients with cancer and other immunocompromised persons were present. Amplity determined that this risk was too great and could place all of Amplity's customer relationships and customer contracts in jeopardy. This could have literally put an end to Amplity's business | **Denied**. Green's statement is inadmissible as not complying with 28 U.S.C. §1746 These assertions cannot be presented in a form that would be admissible in evidence. Object as speculative and hearsay as to "what was known" (by who) "Amplity was concerned" is vague and hearsay and a legal conclusion. Object to "would have put Amplity and its clients at risk of liability" is speculative and a legal conclusion. Put an end to Amplity's business is speculative with lack of personal knowledge. Risk is speculation and lacks foundation and personal knowledge. Green is attempting to state an economic analysis which O'Loughlin specifically stated was not performed by the Review Board. The Review Board did not conduct any global financial cost analysis, or any specific economic cost analysis as to a specific employee, as to accommodating any Field Based employees with religious objections to the Covid 19 vaccine injections. ECF 78-5 (Ex. 6) p.32¶2-10 (O'Loughlin deposition in Isensee) Ex. A ECF 78-19 p.135¶14-21; p.165¶4-6; p.58¶1-4; p.59¶14-24; p.60¶5-19; p.111¶11-19. |
| 124 | On November 22, 2021, Welcome informed Amplity of her decision not to get the COVID-19 vaccine. | **Denied**. The citation does not support the assertion. |

| | | Objection as to "Not to get the vaccine" is vague.<br>What Emily said was:<br>"As stated on our phone conversation, I will not be receiving the current options for Covid-19 vaccines. I am also not voluntarly resigning. It is inappropriate for the company to even suggest that an employee should voluntarily resign considering there is currently no lawful mandate in place requiring vaccination status for employment." |
|---|---|---|
| 125 | Because COVID-19 vaccination was required for the Biosimilar Account Specialist role, Welcome was placed on an unpaid leave of absence beginning November 29, 2021, although she was permitted to use paid time off during the period. | **Admit** that the requirement alone, without any interactive process, resulted in Emily forfeiting her job and being placed on unpaid leave.<br>**Denied in part.** Amplity 195 doesn't say "unpaid leave of absence." The email says "unpaid leave." |
| 126 | Grahovac was put on an unpaid leave of absence on December 2, 2021. | **Denied**. There is no Amplity 388  Goes from 258 to 379 |
| 127 | Welcome was terminated on December 13, 2021. | **Denied**. There is no Amplity 306-307 |
| 128 | Grahovac was terminated on December 10, 2021. | **Denied**. There is no Amplity 353-354 |
| 129 | Welcome and Grahovac were terminated based upon their failure to comply with an Amplity policy that applied to all US field-based colleagues, and the consequence of termination applied to all such employees who failed to get vaccinated and could not obtain a 100% remote position, regardless of if they choose to file an exemption request based upon religion. | **Denied**.<br>Object as the Interrogatories are inadmissible hearsay<br>The contention is also an admission that it was predetermined to terminate all employees who requested an accommodation because it does not claim that Amplity could not accommodate without undue hardship. Instead, it asserts that it was "regardless of if they choose to file an exemption request based upon religion."  The Title VII process mandates Amplity not relegate an accommodation request as irrelevant.<br>It is further controverted as Amplity claimed they were terminated because each violated the Organon vaccine policy.<br>It is controverted in Amplity's EEOC Charge Response stating Emily was fired because she violated the Organon policy.<br>ECF 78-10 (Ex. 13)<br>ECF 78-17 (Ex. 26) (Admissions) para. 42 ("Organon implemented a policy that required all Amplity field based |

| | | representatives assigned to their contract to be fully vaccinated by November 24, 2021"). |
|---|---|---|
| | | It was predetermined that all requesting employees would forfeit their positions and be placed on unpaid leave as a one-size fits all with no case by case analysis.<br>Ex. A ECF 78-19 (O'Loughlin), p.104¶10-15; p.105¶14-18; p.107¶12-18; p. 118¶8-15. O'Loughlin p.135¶14-21; p.165¶4-6; p.58¶1-4; p.59¶14-24; p.60¶5-19; p.111¶11-19.<br>Ex. B ECF 78-20 (McAndrews) p.122¶5-7; p.197¶9-17; p.270¶15-22; p.145¶6-20; p.150¶7-11.<br><br>There was no decisions to be made and why no vote was ever taken later.<br>Ex. A ECF 78-19 (O'Loughlin) p. 72: 17-p.73:17 ("There was no voting….Saying there was a vote is explicitly indicating there was an act") |
| 130 | Amplity separated fifteen employees (either termination or resignation) for failing to comply with its Vaccination Policy, including several that did not posit religious grounds, but were terminated, nonetheless | **Denied**.<br>Object as the Interrogatories are inadmissible hearsay<br>The citation does not support the assertion. Amplity 1379 doesn't say terminated or resigned  Object as hearsay  with no personal knowledge or foundation |
| 131 | In February 2022, within two months after her termination, Welcome began employment with Abbvie, a drug manufacturer at a base salary of $155,000 (plus bonus opportunities and other benefits, and has already had a salary increase and a promotion), which was higher than her Amplity base salary. | **Denied** to the extent that her new position is not the same as to all responsibilities, geography, and travel.  Emily's new position was a much larger territory requiring more travel.<br>When Emily left, she had the state of Missouri. ECF 78-22 p.12:8-13.Emily's territory with Abbvie was larger. P.128:1-7. And the new position requires her to travel much more. P.129:20-25. |
| 132 | Other than Abbvie, "a number" of companies that Welcome applied to refused to interview her because she was not vaccinated for COVID-19. | **Admit** although not a material fact |
| 133 | In February 2022, within two months after her termination, Grahovac began employment with TeraSera Therapeutics at a base salary of $146,500 (plus bonus opportunities and other benefits, and has already | **Admit** although not a material fact |

| | | |
|---|---|---|
| | had a salary increase), which was higher than her Amplity base salary. | |
| 134 | Other than TeraSera Therapeutics, 100% of the other companies Grahovac applied to required the COVID-19 vaccination. | **Admit** although not a material fact |

## Additional Statement of Facts

1. On December 10, 2021, Karen McAndrews communicated to Charlotte Grahovac that there were no positions open for her. McAndrews said there were no positions open for the future and that "we can't keep you on a leave of absence so we're going to have to separate with you but you still have benefits through the end of the month." Plaintiffs' Ex. 2 (Charlotte Sworn Statement).

2. Charlotte asked McAndrews if there were any positions in her Chicago area if she was vaccinated. McAndrews said "we don't have anything." McAndrews said "we just can't keep you on leave of absence indefinitely. We don't have any new business or remote jobs and we don't know if we will have jobs available – that's why they are telling me to tell you this." Plaintiffs' Ex. 2.

3. Charlotte told McAndrews that "I don't know why my religious exemption wasn't accepted and no reason was given me other than I didn't prove it to you." McAndrews said "Charlotte, they're not approving any accommodations just so you know – none."

4. Charlotte told her "that's a problem – that's an issue. It feels like retaliation and I'm being discriminated against." McAndrews said "I keep asking senior leadership what the deal is but no one is giving me a response." Plaintiffs' Ex. 2.

5. Charlotte told McAndrews that they "could reconsider my exemption and re-instate my job." McAndrews said "this stinks all the way around" to which Charlotte said "you

are absolutely right – it absolutely does." McAndrews said "I know this is lip service and I know you are hoping."  Plaintiffs' Ex. 2.

6. Charlotte told McAndrews "so they aren't going to look at my religious exemption and the additional information I sent and then have them reconsider the denial?" McAndrews said she "asked senior leadership that same question but they are adamant – adamant that we have this policy and they aren't going to change this policy. Maybe you could find a different company and I will say this part out loud – who is a little bit more flexible.  I know this stinks.  I don't make the policy at Amplity and I wish I wasn't working through these issues to be honest."  Plaintiffs' Ex. 2.

7. Charlotte told McAndrews that "I understand there are people at the clients being Organon who have employees who gave them medical and religious exemptions so to me if you're serving the client and the client's interests in their own employees is higher than someone who is a contractor that doesn't make sense to me." Plaintiffs' Ex. 2.

8. McAndrews said "well, they can do whatever they want with their employees" and Charlotte said to her "but you guys say you follow the client's lead so if that is the case why wouldn't we be afforded the same exact opportunities?"

9. McAndrews said "I know of one client that – and it wasn't Organon – that we want vaccinated people on the contract.. if you're not able to provide that then we're going to pull the contract. But I did hear about accommodating one person even in that contract." Plaintiffs' Ex. 2.

10. Charlotte said to McAndrews "it still sounds like discrimination to me if I am on a contract and the client is affording their own employees exemptions I don't see how

xlv

Amplity wouldn't – it would have to be on a case by case basis with each contract – not just a blanket over the top across everyone in the company that doesn't make sense to me.  It feels very discriminatory." Plaintiffs' Ex. 2.

11. Paul William DeSilva was a peer of Karen McAndrews and held the same human resource position as Karen McAndrews. Ex. B ECF 78-20, p.163:5-13.

12. Amplity's Rule 26 disclosures do not identify any third party witnesses associated with Nabriva, Alkermes, Organon, Merck, Novartis, Scynexis, UGNX, Aadi, Harmony, Takeda, Ipsen, Galderma. Ex. 4 (Rule 26 disclosures).

13. During 2021, Amplity contracted with companies Nabriva, Alkermes, Organon, Merck, Novartis, Scynexis, UGNX, Aadi, Harmony, Takeda, Ipsen, Galderma to provide Amplity employees to market drugs promoted by those companies. Ex. B ECF 78-20,(McAndrews deposition) p.251 ¶10-15; ECF 78-12 (Ex. 17) (Spreadsheet).

14. Ex. 17 from McAndrews deposition was a list compiled by McAndrews of the number of Amplity employee religious requests in 2021 and the number of employees terminated or quit because of the Amplity vaccine mandate. Ex. B ECF 78-20 p.254¶16-20; p.255¶12-14; p.258¶8-17; p. 259¶7-16.

15. Amplity did provide different accommodations to certain Amplity sales representatives allowing them to keep their sales position while not being "fully vaccinated." Ex. B ECF 78-20, p.163¶5-21; p.173 ¶7-25.

16. One employee who was given this accommodation was told to keep it a secret. Ex. B ECF 78-20, p.163¶5-21; p.173 ¶7-25.

17. McAndrews stated that this was done because if others found out they would expect the same treatment. Ex. B ECF 78-20, p.163¶5-21; p.173 ¶7-25.

18. McAndrews said she wasn't surprised because "we might have others coming forward" saying "I want the same deal he got." Ex. B ECF 78-20, p.163¶5-21; p.173 ¶7-25.

19. McAndrews stated Scynexis Field representatives obtained religious accommodations to remain in their positions while not being fully vaccinated. Ex. B ECF 78-20, p.175 ¶7-16; p.175 ¶18-p.177 ¶12.

20. McAndrews said that the fully vaccinated requirement put upon Emily and Charlotte was because Organon required it.  Ex. B ECF 78-20, p.57¶22-p.58¶12; ECF 78-15 (Ex. 24).

21. McAndrews said as of "November 24, Organon requires vaccination of Amplity employees." ECF 78-15 (Ex. 24).

22. In O'Loughlin's opinion, the Review Board would have provided the Organon vaccine policy to an Amplity employee if the Review Board was expecting that employee to comply with that policy. Ex. A ECF 78-19 p.86¶17-20.

23. Under those circumstances O'Loughlin believed Amplity would have provided the Organon vaccine policy to Emily and Charlotte because "job requirements would be communicated to the employee." Ex. A ECF 78-19 p. 86¶21-25.

24. Amplity never provided whatever the Organon vaccine policy was to Emily or Charlotte. Ex. A ECF 78-19 p.88¶16-22.

25. O'Loughlin believed that even if Organon had given Emily a religious accommodation to Organon's vaccine policy that the Review Board would have terminated Emily's employment anyway. Ex. A ECF 78-19 p.90¶17-24.

26. Amplity contended to the EEOC that Organon required Amplity employees to be vaccinated for the covid 19 virus. ECF 78-15 (Ex. 4), p. 3. (EEOC Charge Response).

27. In the position statement made by Amplity to the EEOC, it claimed that Emily was terminated because she failed to comply with the Organon covid-19 vaccine policy. ECF 78-15 p. 3.

28. In the Amplity position statement to the EEOC regarding Emily's EEOC charges, Amplity affirmatively states more than once that "Ms. Welcome was terminated from employment as of December 13, 2021 for failure to comply with Amplity's and Organon's vaccination policy" and "Complainant was terminated for failing to comply with the Amplity vaccination policy and for non-compliance with Amplity's customer, Organon's vaccination policy." ECF 78-15 p.3.

29. Amplity further stated to the EEOC that "Organon implemented a policy that required all Amplity field based representatives assigned to their contracts (as Complainant was) to be fully vaccinated no later than November 24, 2021." ECF 78-15 p.4.

30. Amplity further stated to the EEOC that "Ms. Welcome was terminated on December 13, 2021 for failure to comply with Amplity's and Organon's vaccination policy." ECF 78-15 p.5.

31. In Amplity's position statement to the EEOC regarding Charlotte's EEOC Charge, Amplity stated "Charging Party was terminated for failing to comply with the Amplity vaccination policy and for non-compliance with Amplity's customer, Organon's vaccination policy." ECF 78-10 (Ex. 13) (Amplity EEOC position statement to Grahovac EEOC complaint) p.3.

32. Amplity's position statement regarding Charlotte's EEOC Charge also stated "Similarly, Amplity's customer Organon implemented a policy that required all Amplity field based representatives assigned to their contracts (as Charing Party was) to be fully vaccinated no later than November 24, 2021." ECF 78-10 p.4.

33. In the Charge response Amplity stated Charlotte had three options – none of which included retaining her sales position without being fully vaccinated: "Consider other jobs with Amplity that are 100% remote (and therefore not subject to the vaccination policy); (2) Get vaccinated; or (3) Separate from Amplity." ECF 78-10 pp.4-5.

34. Amplity stated to the EEOC that "Despite the violation of Organon's requirement to be fully vaccinated by November 24th and Amplity's requirement to be fully vaccinated by December 1, 2021, Ms. McAndrews told Charging Party that Respondent would consider her to be compliant as long as she received her first dose and was in process. Charging Party agreed and reaffirmed her decision to get vaccinated." ECF 78-10 p.5.

35. Amplity, through its Review Board, pre-determined to deny all employee accommodation requests to Amplity's covid-19 vaccine mandate and offer a one-size-fits-all proposal as to those employees in field based sales positions. Ex. A ECF 78-19  p.104 ¶10-15; p.105 ¶14-18; p.107¶12-18; 108 ¶16-23; Ex. B ECF 78-20 p.190 ¶4-23; p.195 ¶8-16.

36. The Review Board predetermined that all non-compliant employees would lose their salaried sales position prior to the Amplity vaccine mandate being enacted and published to its employees. Ex. A ECF 78-19  p.104 ¶10-15; p.105 ¶14-18; p.107¶12-18; 108 ¶16-23; Ex. B ECF 78-20 p.190 ¶4-23; p.195 ¶8-16.

37. The Review Board decided exactly what specific accommodation it would offer all Amplity employees weeks before it received the first employee accommodation request. ECF 78-3 (Ex 3) (Amplity Policy Memo); Ex. A ECF 78-19  p.104 ¶10-15; p.105 ¶14-18; p.107¶12-18; 108 ¶16-23; Ex. B ECF 78-20 p.190 ¶4-23; p.195 ¶8-16.

38. The Review Board pre-determined that, for what it called "core" employees, those employees were provided different options – opt to be fully vaccinated or if not take a test 72 hours prior to an in-person meeting. ECF 78-3 (Ex 3): Ex. A ECF 78-19 p.100 ¶23-p.101¶4; p.104¶10-15; p.105¶14-18; p.107¶12-18; p.108 ¶16-23.

39. The Review Board decided, prior to the publication of its vaccine mandate on October 5, 2021, that every Field Based Amplity employee that was not "fully vaccinated" would forfeit their salaried Field Sales position, then have the position filled by a fully vaccinated

individual, and then the employee be placed in unpaid leave status. Ex. A ECF 78-19 p.104¶10-15; p.105¶14-18; p.107¶12-18.

40. O'Loughlin had sent an October 5, 2021, email announcing the policy. ECF 78-1 (Ex. 1) (October 5, 2021 email); Ex. B ECF 78-20 p.289¶24-p.290¶24.

41. That decision, made by this Review Board, was prior to the Review Board's consideration of any religious accommodation request by any Amplity employee. Ex. B ECF 78-20 p.188¶14-25; Ex. A ECF 78-19 p.104¶10-15; p.105 ¶14-18; p.107¶12-18.

42. There was no discussion by the Review Board of the possibility of any Field Based employee keeping her salaried sales position while not being fully vaccinated. Ex. A ECF 78-19 p.170¶13-20; p.171¶14-25; p.104¶10-15; p.105¶14-18; p.107¶12-18.

43. The only option the Review Board determined would happen for these field based sales representatives was just one pathway: each would lose their job, be placed in unpaid leave status, and then apply for another position at Amplity which did not require the employee to be being fully vaccinated. Ex. B ECF 78-20 p.129¶15-22; Ex. A ECF 78-19 p.104¶10-15; p.105¶14-18; p.107¶12-18.

44. Out of the 1,000 Amplity employees, the Review Board would not require approximately 200 "core" Amplity employees to be "fully vaccinated." Ex. A ECF 78-19 p.44¶3-16.

45. These "core" employees worked in two U.S. locations in which there was "in personal contact with each other." Ex. A ECF 78-19 p.19¶1-5.

46. The 200 core employees were client facing role such as HR, finance, technology, legal, and support staff which included O'Loughlin. Ex. A ECF 78-19 p.45 ¶15-21.

47. For those 200 employees the Review Board predetermined an alternative to being "fully vaccinated" by obtaining a negative Covid PCR test 72 hours prior to the personal contact. ECF 78-3; Ex. A ECF 78-19 p.126¶8-20; p.132¶17-p.133¶15.

l

48. The Review Board determined a negative Covid PCR test would sufficiently address the risk of virus transmission. Ex. A ECF 78-19 p.127¶4-20.

49. Amplity received communications from its client companies that some had a position on a covid 19 vaccine requirement. Ex. B ECF 78-20 p.33¶2-7.

50. Some clients shared that they did not have a covid 19 vaccine requirement. Ex. B ECF 78-20 p.33¶8-20.

51. McAndrews stated that merely because a company client had a vaccine mandate for its own employees did not mean that Amplity employees assigned to that contract had to be vaccinated. Ex. B ECF 78-20 p.38¶22-p.39¶2.

52. Amplity never offered Emily or Charlotte a comparable position that removed the conflict between the fully vaccinated mandate and their respective religious practice, and preserved the terms, conditions, or privileges of their employment. Ex. B ECF 78-20 p.190 ¶4-23; p.195 ¶8-16; Ex. B, p.129¶15-22; Ex. A ECF 78-19 p.104¶10-15; p.105¶14-18; p.107¶12-18.

53. Before making this decision, the Review Board conducted no analysis as to transferring or substituting Amplity employees between Amplity's clients. Ex. B ECF 78-20 p.13¶17-p.14¶11; p.1¶19-p.15¶13; p.89¶13-20; p.139¶23-p.140¶5.

54. Before making its decision, the Review Board never considered any analysis as to reconfiguring territories, increased costs, or administrative difficulties because "it's not that easy" and "it's just not standard practice. It's not something that we typically would do in any situation." Ex. B ECF 78-20 p.11¶16-p.12¶14.

55. The Review Board did not conduct any analysis to determine the costs of reconfiguring or reassigning Emily's or Charlotte's territory if any the specific facilities within their territory actually denied – or would deny them – personal contact because of their vaccination status. Ex. B ECF 78-20 p.11¶16-p.12¶14; p.145¶6-20; p.150¶7-11; p.13¶17-p.14¶11; p.1¶19-p.15¶13; p.89¶13-20; p.139¶23-p.140¶5.

56. Amplity never presented any estimate of costs it would or would have incurred if it had allowed Emily or Charlotte to retain their positions without being vaccinated. Ex. B ECF 78-20 p.11¶16-p.12¶14; p.145¶6-20; p.150¶7-11; p.13¶17-p.14¶11; p.1¶19-p.15¶13; p.89¶13-20; p.139¶23-p.140¶5.

57. The Review Board never conducted any analysis as to the specific facility and hospital systems in Charlotte's and Emily's territory had actually denied either access or would deny their respective requests for a religious exemption submitted through the hospitals' vendor credentialing systems at the time of their respective terminations. Ex. B ECF 78-20 p.11¶16-p.12¶14; p.145¶6-20; p.150¶7-11; p.13¶17-p.14¶11; p.1¶19-p.15¶13; p.89¶13-20; p.139¶23-p.140¶5.

58. The Review Board did not conduct any analysis allowing Emily Welcome to continue to service her virtual accounts with Organon which would not require being fully vaccinated. Ex. B ECF 78-20 p.145¶6-20; p.150¶7-11.

59. The Review Board did not conduct any global financial cost analysis, or any specific economic cost analysis as to a specific employee, as to accommodating any Field Based employees with religious objections to the Covid 19 vaccine injections. ECF 78-5 (Ex. 6) p.32¶2-10 (O'Loughlin deposition in Isensee); Ex. A ECF 78-19 p.135¶14-21; p.165¶4-6; p.58¶1-4; p.59¶14-24; p.60¶5-19; p.111¶11-19.

60. O'Loughlin acknowledged there were possible accommodation considerations if money were no object. Ex. A ECF 78-19 p.139¶6-16.

61. The Review Board determined that it was a reasonable accommodation for the employee's salaried position to be forfeited, then be placed on unpaid leave, then have the employee wait for a 100% remote position that paid $40,000 less than the Field Based salary. Ex. B ECF 78-20 p.190 ¶4-23; p.195 ¶8-16.

62. O'Loughlin was unaware that the Review Board was required to consider all possible accommodations for an employee requesting a religious accommodation to the vaccine mandate. Ex. A ECF 78-19 p.141¶7-18.

63. O'Loughlin understood the interactive process to be "making sure we understood what the accommodation was, the review of that, engaging with the individuals to help them understand what the remote positions were that we had available to them." Ex. A ECF 78-19 p.143¶3-9.

64. O'Loughlin said the accommodation process was the employee "waiting for a virtual position to open up." Ex. A ECF 78-19 p.144¶1-4.

65. All of the remote roles offered to Emily, after she lost her sales position and put in unpaid leave status November 29, 2021, required the employee to be fully vaccinated. ECF 78-22 (Ex. D) (Welcome deposition), p.85¶7-p.86¶10; p.88¶14-19.

66. Amplity had posted Emily's position as vacant on LinkedIn prior to Emily being put on unpaid leave status November 29, 2021. ECF 78-22 p.67¶1-14.

67. Emily received an email from an Amplity employee giving Emily closeout instructions in which Emily was told Emily had already resigned and needed to ship back her computer prior to being placed on unpaid leave. ECF 78-22 p.68¶1-11.

68. McAndrews omitted telling Emily that the remote positions being offered also required a substantial decrease in pay which Emily considered to be misrepresentations to her. ECF 78-22 p.87¶1-20.

69. Emily's direct supervisor was Curt Gauen and he refused to communicate with Emily. ECF 78-22 p.12¶14-23; p.39¶3-15; p.73¶20-p.74¶25.

70. Emily was instructed to only have communications with McAndrews. ECF 78-22 p.12¶14-23; p.39¶3-15; p.73¶20-p.74¶25.

71. Amplity had no communications with Emily and Charlotte, prior to October 5, 2021, regarding the Review Board's decision to terminate all non-compliant Field Based employees from their sales position and place them on unpaid leave. Ex. A ECF 78-19 p. 117¶24-p.118¶9.

72. The Review Board had already made the decision that the only thing Amplity was willing to do for employees objecting to the covid 19 vaccine mandate was then make one offer, which is 100% virtual position if it was open which was prior to any interactive process. Ex. A ECF 78-19 p.118¶8-15.

73. The Review Board determined that a Field Based employee would have no direct communications with the Review Board. Ex. B ECF 78-20 p.142¶1-17.

74. The Board set up Erica Smith as its contact person who would communicate to Human Resource employees, such as Karen McAndrews, who in turn would communicate with the Field Based employee. Ex. B ECF 78-20 p.142¶1-17.

75. Under this tiered communication procedure, Field Based employees seeking a religious accommodation were limited to communicating with the Human Resources representative. Ex. B ECF 78-20 p.142¶1-17.

76. Unlike how religious accommodation requests were normally handled, the Review Board's blanket decision made prior to October 5, 2021, was made without consulting any of the Field Based employees' direct supervisors and these employees were not allowed to engage in interactive dialogue with Amplity's decision making Review Board. ECF 78-22. p. 13 ¶4-9; p.71 ¶3-10; Ex. A ECF 78-19 p.109 ¶19-25; p.110 ¶9-15.

77. Charlotte Grahovac, Emily Welcome, and Natalie Isensee, were all Field based sales representatives assigned by Amplity to the Organon company as part of Amplity's outsourced sales team promoting Organon drugs to doctors and medical facilities. ECF 78-22 p.12¶4-13; p.64¶5-24.

# ARGUMENT

## Amplity's Motion Should Be Denied

### Amplity's Spaghetti Approach of Shifting of Reasons Alone Has Created Jury Questions

Amplity claims accommodating either Emily or Charlotte would have caused a breach of contract – or not met "Organon's stated expectations." All based upon Eric Green's objectionable legal conclusions, speculation, and hearsay. But let's back up. In a spaghetti-throw-against-the-refrigerator-to-see-what-sticks approach, Amplity has been remarkably audacious in its ever shifting theories of what exactly caused the Review Board to fire Charlotte and Emily. Amplity has several theory horses it has saddled before and during this litigation. First, it saddled the Organon horse and according to this version, Organon *required* Amplity to require Emily and Charlotte to be vaccinated. Then, Emily and Charlotte were fired because they didn't comply with *Organon's* vaccine policy. But Amplity realized it could not ride that horse to the finish line for lots of reasons. It raises a co-employer scenario. Then, even as board member O'Loughlin admitted, given that Amplity was expecting the Organon vaccine policy to be complied with, Amplity should have provided that policy to Emily and Charlotte. But oops – Amplity didn't do that. And if Organon provided for religious accommodations why couldn't Emily and Charlotte ask for and receive religious accommodations from Organon? But oops again – Amplity never provided plaintiffs a pathway to obtain a religious accommodation to the very policy Amplity said it fired both for not following. O'Loughlin then said even if Organon had provided

1

accommodations both would have been fired anyway!  So Amplity kind of let Organon Policy pony go to pasture and then pretended it never existed in the first place.

But Amplity had more backup horses to saddle.  Next came a second horse from the stable called the "competitive horse."  Amplity's interrogatory response then claimed Emily and Charlotte had to get vaccinated so that Amplity could be "competitive."  But what exactly was the burden?  Organon never complained.  At the time of their termination they were able to call on the facilities.  But under this theory Amplity was now no longer the victim of Green's imagination of Organon's "expectations" – no, it was now just the Review Board's bright idea.[4]  This competitive horse had more than its share of problems.  Saying a company wants to be "competitive" is all about money.  Green shotguns a plethora of imagined ideas about competition and like Chicken Little, exclaims the sky is falling with zero proof. It's all made up after the fact. The Review Board didn't consider which clients of Emily and Charlotte required vaccinating, the percentage of their clients who permitted them to continue to make personal sales calls, or what Organon's position was on that. But *Groff* got decided and now their facts again did not line up with the competitive horse they were riding.  What to do?

So Amplity herded back the first Organon horse it put to pasture.  Amplity declared there was again an Organon connection – this time a brand new risk. The story goes like this:  we will say that we have a contract with Organon, that Organon contractually "expected" vaccinated employees from Amplity, and that if Emily and

---

[4] Oloughlin p.47:7-10. Q And it's not because clients asked you to do that or told you to do that, you just thought it was a good idea, right? A We worked in -- yes. Yes. Yes.

Charlotte continued to service Organon clients unvaccinated that it *could* – no it *would* – jeopardize the entire Organon contract. But that takes on a contract analysis as a matter of law which Green cannot be the substitute. But that still is an economic analysis – losing a client is all relative to the overall business. All clients are not created equal and all have different income streams. But there is that pesky fact that O'Loughlin repeatedly admitted the Review Board conducted no economic analysis at all. What now? Hold that horse as Eric Green arrived on the scene. He says he can ride that competitive horse to the finish line making up an economic analysis after-the-fact. But Amplity wanted to hedge it bets. It saddled yet a third horse – the safety-to-the-public horse saying Emily and Charlotte posed a greater threat of transmitting the covid 19 virus to Amplity employees than the vaccinated employees did. More spaghetti. Regarding this "safety" issue, in the admission responses Amplity admitted it didn't – and still doesn't – know if these women presented any greater health risk than anyone else. The second problem is that Amplity wildly speculated – on purpose – that Charlotte and Emily jeopardized the health of facility patients. Green said both Emily and Charlotte had to have been in contact with these patients "by definition" which is code for "I am just making this up." But Green and his Board never investigated whether any patients had personal contact with Emily or Charlotte – in fact never asked either if they had contact with patients – which neither did. And why would they? For that matter, the Board never looked into any of the facilities.

3

Then Green said Amplity had to require vaccinations for Emily and Charlotte in order to protect Amplity employees – even though both literally had no personal contact with other Amplity employees.  And why was it that if Charlotte was going to have some kind of in person contact with another Amplity employee, why wouldn't the testing option work?  After all, Green and his board graciously accommodated 1/5 of the Amplity work force (200) (including himself and the rest of the Board from the vaccination requirement) by giving them the option to test 72 hours before a face to face contact. If testing worked for these elite employees why not the little people like Emily and Charlotte?

All of these theories have fatal, if not totally dishonest flaws.  These shifting explanations supposes maybe the sum of them all can make up for the individual flaws. Amplity either pretends the maybe one or two horses don't exist, or kind of exist, or that the Court can pick a winner from the stable of horses it has running abreast down the finish line.  These are all *post hoc* rationalizations. *See McNeill v. Tyson Fresh Meats, Inc.*, at *12  (citing *Runkel v. City of Springfield,* 51 F.4th 736, 745 (7th Cir. 2022) (rejecting employer's *post hoc* rationalization).[5]

### Direct Evidence

The Review Board pre-ordained that the moment these two women exercised their right to ask for a religious accommodation that an automatic forfeiture of both

---

[5] *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993) (trier of fact may infer discrimination upon rejecting an employer's proffered reason for termination); *Grant v. City of Blytheville*, 841 F.3d 767, 774 (8th Cir. 2016); *Williams v. United Parcel Serv., Inc.,* 963 F.3d 803, 808-09 (8th Cir. 2020); *Joll v. Valparaiso Cmty. Schs.,* 953 F.3d 923, 932 (7th Cir. 2020) (employer's dishonest explanation of a decision can, by itself, "support an inference that its real reason was unlawful").

4

plaintiffs' pay and positions would occur – and did occur **Full stop**. Call it a spring-loaded gun at the door – the sword of Damocles automatically swooped down the moment each religious accommodation request was made. That is direct evidence of an adverse employment decision simply because Emily and Charlotte exercised their religion asking to be accommodated. Amplity posted Emily's position before she was placed on unpaid leave. It was a "predetermined illegal punishment for requesting a religious exemption." *McNeill v. Tyson Fresh Meats, Inc.,* 2023 WL 8532408 at *7 (N.D. Texas, December 8, 2023). The Review Board did not need any discussion with Emily and Charlotte nor did it need to make any further decisions as O'Loughlin admitted – the "predetermined punishment" was set on autopilot even "before [s]he asked." *McNeill* at *7.

Karen McAndrews admitted to Charlotte that the entire process was a charade – "lip service" as she told Charlotte on the day McAndrews told Charlotte she was fired. McAndrews flat out admitted the discrimination – "Charlotte, they're not approving any accommodations just so you know – none." Of course, even that was a lie when in fact they had given testing accommodations to Amplity employees assigned to the Nabriva and Scynexis contracts (instructing them to keep it a secret) – as well as to McAndrews herself as she was in the elite "core" 200 employee group. McAndrews claimed she confronted leadership "I keep asking senior leadership what the deal is but no one is giving me a response" when even that statement was not true. McAndrews admitted accommodations were never an option from the very beginning. When Charlotte asked if the Board had any intention of reconsidering its

5

denial based on rejecting the sincerity of Charlotte's religious beliefs, McAndrews said "I asked senior leadership that same question but they are adamant – adamant that we have this policy and they aren't going to change this policy. Maybe you could find a different company and I will say this part out loud – who is a little bit more flexible."

Plaintiffs have stated *prima facie* cases for retaliation, disparate treatment, and disparate impact under Title VII. Emily's MHRA claims are similarly stated. Amplity concedes this burden has been met for disparate treatment and retaliation. It is undisputed that each plaintiff had sincere religious beliefs which precluded them from complying with the vaccination requirement for which they requested accommodation but were denied. The uncontroverted facts demonstrate that this requirement had several adverse effects to each plaintiff who could not consent to a COVID-19 vaccination injection for religious reasons. Each lost their position, placed on unpaid leave, and ultimately were terminated. That constitutes disparate impact.

As to all counts including disparate impact, there is direct evidence that Emily's and Charlotte's termination was based upon their exercise of religion. Amplity claims that the "fact that every one of Plaintiff's similarly-situated colleagues that refused to get the COVID-19 vaccine was terminated… unequivocally demonstrates that religious animus was not a motivating factor." But that is not the analysis. These plaintiffs were similar to the other fifth of the Amplity work force who presented this purported health safety risk to fellow Amplity employees. Amplity claimed it needed to protect other fellow employees in the interrogatory

6

responses and in Amplity's October 5ᵗʰ email. Those 200 employees suffered no adverse consequences and were not terminated because they "refused to get the COVID-19 vaccine." The fact that they all had possible personal exposure to other Amplity employees – and were not required to be vaccinated but could be tested – is evidence of animus.

Thus, this policy fell more harshly on the one group than the other. This policy and the way it was applied, had a discriminatory impact on the religious protected class. Disparate-impact claims do not require showing that the protected trait actually motivated the employer's decision. Instead, a "facially neutral employment practice may be deemed illegally discriminatory without evidence of the employer's subjective intent to discriminate that is required in a disparate-treatment case." *EEOC v. Allstate Ins. Co.,* 528 F.3d 1042, 1047 (8th Cir.2008); *Williams v. Wells Fargo Bank, N.A.,* 901 F.3d 1036, 1040 (8th Cir. 2018) (neutral personnel policy or practice; disparate effect of a protected class; and causal connection). But there is more.

## No Accommodation Was Considered or Offered

Numerous clients of Amplity did not require vaccinations. And as McAndrews told Charlotte, she only knew of one client – not Organon – that made that demand. The "failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is *prima facie* evidence that the employer may be acting in bad faith." *Cravens v. Blue Cross & Blue Shield of Kansas City,* 214 F.3d 1011, 1021 (8th Cir. 2000). Reasonable accommodations were possible – such as 72 hour testing – which a fifth of the Amplity workforce was given. In fact, allowing

7

Charlotte and Emily to continue working their territories subject to the facilities' respective credentialling was a possibility. Liability attaches for failing to engage in the interactive process. *See Fjellestad v. Pizza Hut of Am., Inc.,* 188 F.3d 944, 952 (8th Cir.1999) (only if no reasonable accommodation was possible can employer escape liability for failing to engage in an interactive process). Amplity's one size fits all preprogrammed outcome was no accommodation process at all but a "predetermined illegal punishment for requesting a religious exemption." *McNeill* at *7. An employer who "determines what accommodation it is willing to offer before ever speaking with" the employee does not participate in good faith. *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 606 (6th Cir. 2018); *Lowe v. Calsonickansei N. Am., Inc.,* 2020 WL 2473757, at *8 (M.D. Tenn. May 13, 2020). "When the employer fails to engage in the interactive process, it is not likely that an employer will be able to establish on summary judgment the absence of a disputed fact as to the existence of a reasonable accommodation." *Valdez v. McGill*, 462 F. App'x 814, 819 n.5 (10th Cir. 2012).

Amplity made legal and speculated conclusions about what was an essential function of the plaintiffs' respective sales territories. But the Review Board specifically did not consider *any of that at all* as O'Loughlin admitted. This Court should not take at face value Amplity's claims about a job's essential functions – particularly when Amplity did not take the time to do a case analysis to Emily or Charlotte's client facilities – or what the present status of their contacts with each facility. *See e.g. Brown v. Smith*, 827 F.3d 609, 613-14 (7th Cir. 2016) (jury verdict for

8

plaintiff who could not obtain commercial driver's license even where written job description said such license was required for job; evidence of actual duties undermined claim of essential function).

## Rule 26 Disclosures Preclude Any Ability of Amplity to Overcome Hearsay Objections

Amplity has alternatively claimed it had to fire Emily and Charlotte, not because of safety health concerns, but because Organon told Amplity it required covid 19 vaccinated employees from Amplity. The citations to Eric Green, Becky O'Loughlin, and Karen McAndrews about their purported knowledge about all of Amplity's clients, the facilities that those clients visited, the requirements of those facilities, and then the contracts provide no clue as to how they know the things they purport to opine upon – particularly when McAndrews was not a decision maker or part of the Review Board – and then when O'Loughlin testified the Board never considered any of the contracts or purported communications essentially saying that had nothing to with why Amplity enacted its vaccine mandate.

Plaintiffs have challenged all of the plethora of hearsay evidence presented by Amplity. "Without a showing of admissibility, a party may not rely on hearsay evidence to support or oppose the motion" for summary judgment. *Walker v. Wayne Cnty, Iowa,* 850 F.2d 433, 435 (8th Cir. 1988). Amplity cannot overcome hearsay objections to its assertions of fact regarding what Organon – or other of its other clients – purportedly communicated to it as Green, O'Loughlin, and McAndrews might contend. Federal Rule of Civil Procedure 56(c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form

9

that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2). Plaintiffs objected to Amplity's assertions based upon hearsay which Amplity cannot demonstrate that those statements could be offered at trial in an admissible form. *See Smith v. Kilgore*, 926 F.3d 479, 485 (8th Cir. 2019). Rule 26(a)(1)(A)(i) requires a party to disclose the name of any individual likely to have discoverable information. The Rule 26 submission did not disclose any representative or employee of any of Amplity's companies – including Organon. When a party fails to comply with Rule 26(a), the party may not use the witness to provide evidence on a motion "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

### Amplity Cannot Meet Any Undue Hardship under *Groff*

The clarification of the undue hardship standard in *Groff v. DeJoy,* 600 U.S. 447 (2023) now requires an employer to prove that the burden of accommodation "is substantial in the overall context of an employer's business." As the Fifth Circuit in *Hebrew v. Texas Dep't of Criminal Justice,* 80 F.4th 717 (5th Cir. 2023) noted, "this is a heavy burden." *Id*. at 722. The *Groff* decision "suggests that, all other things being equal, larger businesses and institutions must bear a heavier burden in proving undue hardship." *Hebrew* at 725, fn*.

Amplity's original theory of its case was that it did not need to prove undue hardship – it was not asserted as defense in its Answer. Rather, Amplity simply asserted that Emily and Charlotte were terminated for "legitimate business reasons unrelated to their purported religious beliefs or requests for accommodations." ECF 30, p.21 ¶5. This was its stated position in response to the EEOC charges (Emily and Charlotte "terminated for failing to comply with a valid and enforceable company

10

policy"). ECF 78-10, p.7.[6]  It was only after *Groff* was decided that Amplity then wanted to change its theory and filed, without leave of court, an amended answer asserting the undue hardship defense. ECF 39.  But that required Amplity to re-write history which it has attempted to do in its many *post hac* theories on the back of Green's statements. When the plaintiffs propounded interrogatories specifically asking Amplity to provide economics – total income, income from Organon, *etc*. Amplity objected – and never provided that information. When O'Loughlin and McAndrews were deposed in *Isensee* and the present litigation, it was then discovered that the Review Board never conducted any economic analysis – for that matter never considered individual client contracts, or even the facilities that Emily and Charlotte had in their respective territories.

Although Green tries to sneak an economic analysis, Amplity never did that. And its Rule 26 disclosures never disclose one witness from Organon – or any client – that Amplity was going to rely upon purported communications from Organon demanding vaccinated employees from Amplity. Amplity only identified its own employees – and no third party witnesses. Having refused to provide that information, Green cannot, for the first time, do an end-around with his economic numbers of Amplity total income and his statement of Organon's income flow in which

---

[6] ECF 40-1 p. 3 ("Complainant was terminated for failing to comply with the Amplity vaccination policy and for non-compliance with Amplity's customer, Organon's vaccination policy"); p. 5 ("Ms. Welcome was terminated on December 13, 2021 for failure to comply with Amplity's and Organon's vaccination policy…. Ms. Welcome's termination had absolutely nothing to do with her religious beliefs, but instead, with her refusal to comply with a valid employment policy after she received ample notice of the requirements, and was explicitly warned that she may be terminated for noncompliance")..

he also claims a plethora of purported communications from Organon – as well as Amplity's other clients – to justify his speculative "risk" theory. If Amplity wouldn't disclose that information the plaintiffs would rely upon Fed. R. Civ. P. 37(c)(1).

### *Bushra* is Contrary to *Groff*

What is left? Amplity places all its bets on a Pennsylvania district case in *Bushra v. Main Line Health, Inc.*, No. 23-1090, 2023 WL 9005584 (E.D. Pa. Dec. 28, 2023). *Bushra* is an outlier and not persuasive as to interpreting *Groff*. *Bushra* briefly acknowledged *Groff* but then immediately reverts to the Third Circuit's pre-*Groff* holding in *E.E.O.C. v. Geo Group, Inc.*, 616 F.3d 265 (3d Cir. 2010) that "economic and non-economic costs can impose an undue hardship on employers."[7] The *Bushra* court then proceeded to declare an undue hardship in the form of "substantial social" costs – whatever that means. The *Bushra* court added "if not economic costs" but there was no economic analysis provided at all as to the overall size and operating costs of Main Line or potential impact of masking, testing, or quarantining – it was a speculative throwaway statement by that court. And the *Bushra* court was not confronted with what Amplity did in giving 1/5 of its work force different options to be tested prior to personal contact. *Bushra's* analysis was not fact sensitive at all to the totality of factors *Groff* demands such as "temporary costs, voluntary shift swapping or administrative costs" either categorically, or typically, will not amount to a substantial hardship. *Groff* at 471.

---

[7] The *Groff* court engaged in a dictionary-focused consideration of the meaning of "hardship" and "undue hardship." *Groff* at 468-71. A "hardship" must be "something hard to bear," *Id.* at 468-69 and perhaps a matter of "suffering or privation," *Id.* at 469 if not "extreme privation." *Id.*

In *EEOC v. The GEO Group, Inc.*, it addressed a dress policy of the prison Hill Facility which prohibited wearing hats or caps unless issued with the uniform. *Id.* at 267-681. The prison instituted the policy for safety and security reasons. *Id.* at 272. The rationale behind the policy was to prevent the introduction of contraband into the facility and to avoid misidentification. After implementing this policy, Geo Group allowed employees to wear black baseball hats with the company's logo. *Id.* at 267-681. Three Muslim women employees asked for an exception to wear instead a khimar which they had worn prior to the policy enactment. The prison warden refused their request and threatened to either fire or suspend the three. The lower court held that a uniform dress code enhanced cohesiveness, cooperation, and the *esprit de corps* of the prison employees. GEO held that an employee safety risk automatically constituted undue hardship irrespective of the economics of accommodating the particular employee in view of the entire prison system. That is not the *Groff* analysis which *Bushra* errantly relied upon.

The same "safety" issue analyzed under *Groff* would yield a different result as the Fifth Circuit decision in *Hebrew v. Texas Dep't of Criminal Justice,* 80 F.4th 717 (5th Cir. 2023) so held.[8] Substituting a beard for a khimar, it was the same argument but with a different outcome under *Groff*. The Court should follow *Hebrew's* analysis of *Groff* which requires an economic analysis to every possible accommodation. The below cases also support following *Groff* and not following the erroneous *Bushra* interpretation:

---

[8] *Groff's* language essentially tracks undue hardship factors under 29 C.F.R. 1630.2(p)(2).

Case 4:22-cv-00830-RK   Document 94   Filed 08/27/24   Page 68 of 71

- *Floyd v. Trinity Central Home Health, LLC,* No. 6:22-cv-061172024 WL 3653055 (W.D. Ark. Aug. 5, 2024)
- *U.S. v. Department of Corrections & Rehabilitation*, No. 2:24-cv-00925, LEXIS 109106; 2024 WL 3088654 (E.D. Cal. June 20, 2024)
- *Isensee v. Amplity, Inc.,* 2024 WL 2132419 (S.D. Ohio West May 13, 2024)
- *Gray v. Main Line Hosps., Inc.,* 2024 U.S. Dist. LEXIS 26885 (E.D. Pa. Feb. 15, 2024)
- *McNeill v. Tyson Fresh Meats, Inc.,* 2023 WL 8532408 (N.D. Texas, December 8, 2023)
- *Smith v. City of Mesa,* No. CV-21-01012-PHX-DJH, 2023 WL 2463819 (D. Ariz. Mar.10, 2023)
- *Hayslett v. Tyson Foods, Inc.,* No. 1:22-cv-01123 (W.D. Tenn. Sept. 20, 2023)

With no economic analysis Amplity cannot demonstrate any undue hardship to its claimed safety burden, much less to all of the other possible accommodations that could have been considered for Charlotte and Emily but were not.

### Putting Aside the Horses, the Review Board Predetermined Every Outcome While Creating the Illusion of Ongoing Case-by-Case Decision Making

A paradox Amplity presents to the Court is this notion that it said, in its policy announcement, that all requests would be considered on a case by case basis – yet in reality preprogrammed the entire process, before it every started, with a one-size fits all determination that every request for an accommodation would automatically be met with forfeiture on the position and placement on unpaid leave. That is why O'Loughlin made the admission that the Review Board never needed to vote thereafter at all – there was nothing left to decide. It had all been preprogrammed on autopilot with one destination: lost pay and job. O'Loughlin said the Review Board was merely there to herd each requestor, like cattle down to the Purgatory holding chute, all the while where McAndrews was offering false hopes like wine mixed with gall on a sponge, adding insult to injury to Emily and Charlotte awaiting (unknown

14

to them) the certain executioner's spring-loaded head shot to these women's careers. And the illusion was certainly orchestrated on a premediated basis. This Review Board set up a hide-the-nut kind of whisper game shielding itself, as the decision maker – from any actually contact or dialogue with the employee. It set itself up like the great Wizard of Oz. Behind that curtain it only communicated with Erica Smith who then spoke to the Human Resource employees Karen McAndrews and Paul William DeSilva. They in turn, according to O'Loughlin, were to act out a role she called "white glove" which was pretense – merely pretending to be the employee's "advocate."

McAndrews carried through with her "white glove" theatrics giving the wholly false impression that the Board was actually considering Emily's and Charlotte's requests individually, on a case by case basis, when each of their respective fates had already been sealed before the first act of this cruel theatre even began. But McAndrews knew the fix was in from before the beginning – there wasn't any advocating at all – she knew Emily's and Charlotte's Purgatory fate the moment each asked for an accommodation. She led both on as though the Board would really consider their unique situations, the facilities that were in their areas, and the idea of possible transfers or modifications of territory. But it was all theatre.

## Conclusion

The material facts in Amplity's motion are completely controverted. Amplity's motion should be denied.

15

By:/s/Linus L. Baker
Linus L. Baker MO 44980
6732 West 185th Terrace
Stilwell, Missouri 66085-8922
913.486.3913
913.232.8734 (fax)
E-Mail: linusbaker@prodigy.net
Attorney for the plaintiffs

## CERTIFICATE OF SERVICE

On this day of August 27, 2024, the above document was filed with the Court's CM-ECF system which will provide notice to all counsel of record.

/s/Linus L. Baker
Linus L. Baker